No. 88,646

STATE OF KANSAS *ex rel.* CLYDE D. GRAEBER, SECRETARY OF THE DEPARTMENT OF HEALTH AND ENVIRONMENT, *Plaintiff/Appellee*, v. MARION COUNTY LANDFILL, INC., *Defendant/Appellee,* and THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MARION, KANSAS, *Defendant/Appellant.*

(76 P.3d 1000)

Opinion filed September 19, 2003.

*J. Steven Pigg*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, argued the cause and was on the briefs for defendant/appellant.

*Russell L. Mills*, of Derby, argued the cause and was on the brief for defendant/appellee.

*William L. Anderson*, of Topeka, argued the cause and was on the brief for plaintiff/appellee.

The opinion of the court was delivered by

DAVIS, J.: The Kansas Department of Health and Environment (KDHE) filed suit against Marion County Landfill, Inc., (MCLI) to enforce its administrative order which required MCLI to cease its landfill operation in Marion County and to perform closure and postclosure operations. The KDHE joined the Board of County Commissioners of the County of Marion, Kansas, (County) under alternative theories that the County was liable for the closure and postclosure operations by statute and as guarantor for MCLI's performance. The KDHE settled with MCLI and moved for summary judgment against the County, which the district court granted. The

County appealed. We affirm in part, reverse in part, and remand for further proceedings.

## Facts

Tom Grosse operated a landfill in Marion County, Kansas, located in the southwest quarter, section 14, township 20 south, range 3 east under KDHE permit 158 dated March 17, 1976. The original permit covered the entire quarter section, although Tom Grosse owned only the west 80 acres, the site of the actual landfill. His nephew, Jack Grosse, owned the east 80 acres of the quarter section. At the time the KDHE permit was granted, it was not necessary that the permit holder own the property upon which the landfill was to operate. The KDHE permit for operation of the landfill was personal and expired with the death of the holder.

Tom Grosse died June 11, 1993. His surviving spouse, Mary Lou Hoberecht, and his four children, William Grosse, Candice Green, Stephen Grosse, and William Grosse continued to operate the landfill without a permit. Together they formed a corporation, MCLI, on October 20, 1993. MCLI distributed 80 shares of its stock to Tom Grosse's heirs in exchange for the west 80-acre tract and four pieces of equipment essential to the operation of the landfill. Mary Lou received 40 shares and each of the children received 10 shares. On June 1, 1996, Mary Lou gave each of the children 10 shares, leaving the four children as the only shareholders, each with 20 shares. Following the death of Tom Grosse, MCLI applied for a temporary permit to operate the landfill and was eventually granted a temporary permit from the KDHE on June 11, 1996. MCLI operated the landfill from 1993 until it closed on October 9, 1996.

MCLI transferred the west 80 acres, with the exception of the 30 acres containing the landfill cells, to M.S.W., Inc., (MSW) a corporation operated by MCLI's attorney. Jack Grosse transferred the east 80 acres to the heirs of Tom Grosse, who subsequently transferred them to MSW.

Before Tom Grosse's death, the KDHE urged Marion County to support closure of the landfill. On February 10, 1992, Charles DeForest, chairperson of the County Commission, moved that the

County "guarantee the closure of two or three acres as the operator, Tommy Grosse, has given a commitment to bring the closure up to date." The minutes further note that the "[County] will guarantee the closure of any additional acreage necessary." County Commission minutes reflect that Charles Linn of the KDHE "recommended a Letter of Resolution or guarantee from [the County] to commit funds to close the last acre or two; suggested that $7,500 would be sufficient." On February 13, 1992, DeForest sent a letter to the KDHE regarding the guaranty stating that "[t]he enclosed copies of the minutes of that meeting are intended to convey our guarantee that the landfill will meet [KDHE's] current closure and post closure fund regulations and allow for the landfill permit renewal."

Following Tom Grosse's death in 1993, Linn reported to the County that improvements needed to be made at the landfill and that the County needed to watch the landfill closer. Linn advised "that a commitment was needed from the County for closure funds," and "that the post closure and operation maintenance fund was Grosse's responsibility." That same year, William Grosse and Stephen Grosse, doing business as MCLI, filed a lawsuit against the County. The record does not indicate the nature of this action. However, the record does contain a journal entry, filed August 31, 1994, and approved by counsel for the parties, which provided:

"THEREUPON counsel for the Petitioners and the Respondent announce to the Court that they have agreed to dismiss this case without prejudice and that the parties have entered into a settlement of their differences such that the [County] shall be responsible for providing financial assurance for the closure of the Marion County Landfill and pay for post closure costs."

On February 7, 1994, the County was briefed by the KDHE on the regulations surrounding the operation of the landfill. The KDHE advised the County that after April 9, 1994, additional regulations would be imposed which the County should consider before continuing with its present site. The KDHE

"recommend[s] closing now if you find any problems that will cause problems later as corrective action is very costly and not feasible for small counties. The Operation Plan is 60% to 70% of operating costs. If landfill runs past April 9,

1994, you must be prepared to accept the financial costs for bonds to meet the financial costs or need to put money aside now."

The record does not contain specific information regarding the impact of the above regulations, but it is clear that the County was aware the continued operation of the landfill beyond April 9, 1994, would involve a substantial increase in cost.

Approximately 8 months later, on December 12, 1994, the County entered into an agreement with MCLI in order to extend the operation of the landfill until October 8, 1996. In order to satisfy the KDHE and assure the continued operation of the land-fill, the County guaranteed closure and postclosure costs. MCLI agreed to accept the primary responsibility for the closure and postclosure costs. Among many other contractual provisions dis-cussed below, the contract provided that any transfer of the landfill property would be subject to the County's rights under the con-tract. The evidence establishes that the KDHE would not have authorized the continued operation of the landfill without the County's guaranty.

Beginning in October 1995 and extending through June 1996, in a series of letters sent by the County to MCLI, the County claimed that MCLI had breached its contractual obligations to the County by failing to secure a permit from the KDHE for continued operation of the landfill and by attempting to transfer the landfill property to Browning-Ferris Industries of Kansas (BFI). Through-out this time, MCLI denied any breach of the contract.

On May 31, 1996, the County commissioners signed another separate written guaranty for the closure and postclosure proce-dures as required by the KDHE in the event MCLI could not perform those procedures. On September 30, 1996, the KDHE, in a letter sent to MCLI and the County, approved the County's guaranty agreement. On October 7, 1996, the County again claimed that it was no longer bound by its guarantee for the closure and postclosure of the landfill because MCLI breached its obli-gations under its December 12, 1994, agreement with the County, which entitled the County under its May 31, 1996, guaranty to cancel its guarantee. The County also claimed that MCLI's failure

to comply with the preclosure requirements effectively relieved the County of its guaranty.

Herbert Bartel, County Zoning Administrator, explained in his deposition that the May 31, 1996, guaranty was made because the County needed a place to put its waste. Linda Peterson, commissioner and signatory of the guaranty, agreed in her deposition that the KDHE's permission to operate the landfill until October 9, 1996, was valuable consideration for the County's guaranty.

On June 11, 1996, the KDHE issued its order permitting MCLI to operate the landfill until October 9, 1996. The enforcement of this order forms the basis of the present lawsuit. The order required MCLI to perform clean-up and closure procedures. The KDHE ordered MCLI to submit a closure and postclosure plan that complied with statutes and regulations within 30 days of the order. Further, the KDHE ordered MCLI, its agents, or its assigns to implement the plan as approved by the KDHE. The KDHE ordered MCLI to file a restrictive covenant in a form approved by the KDHE.

MCLI filed the restrictive covenant on July 3, 1996. The covenant restricted the use of the west 80 acres to use as a landfill. The covenant required all future land uses to be "conducted in a manner which will protect and preserve the integrity of the environment and all waste containment and monitoring systems designed, installed, and operated during operation of the disposal areas or during the postclosure period," and required the KDHE's approval for all improvements to the property. The covenant granted the KDHE an easement to enter the property to perform work and monitoring of the closure plan. The covenant specified that any conveyance of the property must disclose all requirements of the long term care of the property. The covenant also specified that the terms would run with the land and bind any future party acquiring rights to the property.

On October 9, 1996, the landfill closed. William Grosse testified in his deposition that 99% of the waste in the landfill at that point had come from Marion County citizens. Stephen Grosse testified in his deposition that an engineering firm estimated the cost of closure to be $631,000. The district court found that the closure

and postclosure costs exceeded $650,000. Stephen Grosse testified that he understood that, shortly after the closure of the landfill, the projected closure and postclosure costs exceeded $500,000.

After MCLI entered into the 1994 agreement wherein it accepted primary responsibility for closure and postclosure costs, and during the years of 1995 and 1996 with closure of the landfill eminent, MCLI made the following cash distributions to its shareholders amounting to $14,000 in 1995 and $70,000 in 1996:

| Date | Amount |
|---|---|
| 1995 | $14,000 |
| March 15, 1996 | $16,000 |
| May 10, 1996 | $ 5,600 |
| July 15, 1996 | $ 2,800 |
| September 15, 1996 | $ 5,600 |
| October 12, 1996 | $40,000 |

In July 1997, the KDHE warned MCLI that it had failed to comply with closure requirements. The KDHE warning letter noted evidence of erosion, the need for seeding and mulching, insufficient grading, the failure to label water monitoring wells, and insufficient final cover. The KDHE warned that if the "site does not receive adequate final cover soon, the potential for ground water contamination is much more likely to occur."

During March 1998, MCLI transferred the west 80 acres, minus a core 30-acre tract containing the landfill cells, to MSW. William Grosse explained the transfer in his deposition testimony:

"Q. Why did you decide as an officer of MCLI to enter a contract with MSW to sell part of the 160 acres?

"A. Well, we needed legal representation, and really we were kind of in the river without any oars and the boat's sinking, and we had to have some help and we were broke and I knew Russell Mills' family had a transfer station facility in Derby. In fact, we'd dealt with Russell in the past on other litigations and stuff. And so I asked him for his help, 'cause we needed legal help, as you very well can see, so that's how we got involved with them."

William also explained that the shareholders of MCLI were hired by MSW as consultants on landfill matters and would receive $1 per ton if MSW "get[s] the landfill reopened." Mary Lou, William,

Stephen, Amy, and Candace, in their individual capacities, acquired the east 80 acres from Jack and Sharon Grosse on March 30, 1995. They transferred the east 80 acres to MSW, thus leaving MSW with 130 acres of the original quarter section and MCLI with the 30 acres containing the landfill cells which are the subject of the KDHE's closure order.

MSW attempted to obtain a permit to operate a landfill on the acreage it owned, which would be a continuation of the landfill previously operated by MCLI on its 30 acres. However, the Marion County Board of Zoning Appeals (Board) denied a conditional use permit for a landfill and denied MSW's attempts to receive certification for the operation of a landfill at that site. MSW appealed to the district court, which upheld the Board's decision. Upon appeal, the district court decision was affirmed by the Court of Appeals. See *M.S.W. Inc. v. Marion County Bd. Of Zoning Appeals*, 29 Kan. App. 2d 139, 24 P.3d 175 (2001).

On April 9, 1998, the KDHE filed the present action against MCLI seeking to enforce its June 6, 1996, order. Almost 2 years later, on February 8, 2000, the KDHE filed an amended petition against the County, alleging that the County was responsible for the closure and postclosure operations of the landfill. The KDHE alleged that the County was liable for closure and postclosure of the landfill for the following reasons: (1) Pursuant to K.S.A. 65-3418, the County was the generator of the waste which was deposited at an illegal site and, therefore, title to the waste remained with the County; (2) the County, through its contract, guaranteed on December 12, 1994, the closure and postclosure of the site; (3) the County guaranteed the closure and postclosure in a 1992 letter from a county commissioner upon which the KDHE relied; (4) the County is liable because of the statutory requirements put on counties to adopt and implement a solid waste management plan pursuant to K.S.A. 65-3405; and (5) the site is a public nuisance which the County was responsible for abating.

In its original petition, the KDHE sought injunctive relief to stop the transfer of land from MCLI to MSW until the closure and postclosure obligations were fulfilled. The court refused to grant this injunction, explaining that "[t]he Court cannot and will not

issue an injunction prohibiting the transfer of land that was lawfully transferred before suit was filed." However, after the County was joined, the district court revisited the matter and explained that its previous ruling on the injunction was based on the assumption that the April 2, 1998, deed was a valid deed. Upon reconsideration, the district court, in a journal entry filed on February 22, 2000, ruled that the deed transferring the west 80-acre tract from MCLI to MSW was void as to the KDHE based upon a defective legal description:

"It has now been determined that this deed had a defective legal description. The contractual relationship between MCLI and [MSW] is still valid. However, as to plaintiff KDHE, the deed of April 2, 1998, is ineffective. The Court therefore sustains plaintiff's motion and vacates the order of partial summary judgment."

Stephen Grosse testified that on May 1, 2001, MCLI's remaining assets amounted to a "closure fund" containing $1,061. The County and the KDHE attempted to join MCLI shareholders and MSW. The KDHE, in a motion filed on September 4, 2001, asserted on behalf of itself and the County that MCLI's transfer of land to MSW was done to avoid the cost of closure and postclosure. The KDHE also asserted that the shareholders should be joined not only as shareholders of MCLI but as owners of the east 80 acres which was used for operation of the landfill and was an important part of the permitted landfill. The KDHE alleged that MSW would have been aware of MCLI's responsibilities of closure and postclo-sure. The district court refused to join MSW and the MCLI share-holders, and ruled that the statute of limitations had run as to MSW and that K.S.A. 17-7101(b) required a judgment against the cor-poration before its shareholders could be liable.

Before the district court filed its journal entry refusing injunctive relief and refusing to join MSW and the MCLI shareholders, the KDHE entered into negotiations with MCLI and MSW concern-ing closure of the landfill. While MSW had not been a party to this action, MSW joined the action and consented to jurisdiction in order to obligate itself to perform the terms of the agreement be-tween the parties and the corresponding journal entry. However, MSW, by entering its appearance, subjected itself to the jurisdic-

tion of the court for any and all actions regarding this case. See *Aguilera v. Corkill,* 201 Kan. 33, 38, 439 P.2d 93 (1968) ("A party is not permitted to invoke the jurisdiction and power of a court for the purpose of securing important rights from an adversary through its judgment, and then, after obtaining the benefits sought, to repudiate or question the validity of that jurisdiction on the ground the court was without jurisdiction.").

During the hearing on the KDHE's motion for summary judgment as to the County, MCLI's attorney admitted that MCLI was primarily responsible for closure and postclosure of the landfill and that if judgment was entered in favor of the KDHE against the County, MCLI must indemnify the County. On November 9, 2001, the district court granted KDHE summary judgment against the County based upon the following stated reasons:

"a. Marion County is statutorily responsible for cleanup of solid waste that it generated.
"b. That the dump site . . . now constitutes a 'public nuisance.'
"c. Marion County is responsible for cleanup because of the numerous guarantees it made to provide for closure and post closure assurance."

Thereafter, in response to motions to alter its summary judgment, the court modified its summary judgment twice, on January 18, 2002, and again on February 26, 2002.

The court noted that MCLI is primarily responsible for the closure and postclosure costs but that the County would be able to hold MCLI accountable for indemnification in the event the County was required to pay for the costs of closure and postclosure. The court ordered the County to prepare a closure plan pursuant to K.A.R. 28-29-12. The court said its order was final and appealable but the court would retain jurisdiction to "enforce the Orders of KDHE as to closure and post closure cleanup and monitoring presently and for the next 30 years as required by statute."

The County moved to alter or amend the summary judgment, arguing that the October 16, 2001, settlement agreement between the KDHE and MCLI impaired its collateral. In response, MCLI admitted that MCLI "is still legally obligated to pay for the closure and post closure of the old Marion County landfill. It is only if MCLI cannot provide for the closure and post closure that the

guarantees [of the County come] into play." MCLI also pointed out that the County, in fact, received a judgment against MCLI.

On January 18, 2002, the court held that the County "has waived its defense regarding impairment of collateral by its inaction" and granted the following amendment:

"The Court granted summary judgment to plaintiff against both defendants. The Court found that defendant Marion County guaranteed the landfill closing; that MCLI was primarily responsible for the cleanup and that Marion County be indemnified by MCLI in the event that MCLI did not comply with the cleanup orders."

. . . .

"Lastly, the Court assumed that MCLI lacked the financial ability to close the landfill. This assumption by the Court may be correct but the Court has no evidence upon which to make that finding. MCLI, being primarily responsible [for] the closing shall submit a closing plan as required in the original order of [the County]. The plan shall be submitted to the [KDHE] by March 20, 2002. If said plan is not submitted by that date, [KDHE] or [the County] shall prepare a motion, order and affidavit for MCLI to show cause why they should not be held in contempt for failure to abide by the Court's order. The order for [the County] to submit a closing plan is vacated pending further order."

The district court amended its summary judgment a second time on February 21, 2002, at the request of MSW by deleting language from its January 18, 2002, order saying that the settlement agreement required MCLI and MSW "to perform pursuant to [KDHE's] administrative order."

### The Appeal

The County contends on appeal that the district court erred by: (1) concluding that the County was a generator of the solid waste under K.S.A. 65-3418, (2) holding the County liable because the site was a public nuisance, (3) holding that the County was responsible for the closure and postclosure operations of the site as guarantor, (4) holding that the settlement between the KDHE and MCLI and MSW did not release the County from its guaranties, (5) holding that the County's cause of action against MSW was barred by the statute of limitations, and (6) holding that K.S.A. 17-7101(b) barred the County's cause of action against the MCLI shareholders.

## The County's Responsibility under K.S.A. 65-3418

The resolution of the County's responsibility under K.S.A. 65-3418 is a question of law and our standard of review is unlimited. See *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998). The rules of statutory interpretation are well established:

"It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. [Citation omitted.] The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. [Citation omitted.] Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute. [Citation omitted.]" *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 (1998).

The County argued that it was not liable for the closure and postclosure costs of the landfill as a generator under K.S.A. 65-3418(a), while the KDHE and MCLI argued that under K.S.A. 65-3418(a), the title to the waste belonged to the County, and the County was, therefore, primarily responsible for cleaning up the site.

K.S.A. 65-3418 provides in relevant part as follows:

"(a) Title to the solid waste collected, processed or disposed of in accordance with the provisions of this act and the rules and regulations adopted thereunder shall vest in the owner of the solid waste management activity, area or facility in which the solid waste is placed. Solid waste produced from a discrete source disposed of in ways other than in accordance with this act shall remain the property of the generator and the generator shall be liable for removal of the waste, restoration of the area in which the waste was disposed and to provide for lawful disposal of the waste. It shall not constitute a defense to the generator that the generator acted through an independent contractor in the transportation or disposal of the solid waste."

The first sentence of the statute covers the case of title passing when the landfill is in compliance with statutes and regulations. In such cases, title to the waste vests in the owner of the landfill. Where solid waste produced from a discrete source is disposed of

in ways other than in accordance with the act, the solid waste remains the property of the generator and the generator shall be liable for removal of the waste, restoration of the area in which the waste was disposed of, and lawful disposal of the waste. The district court concluded that the County was the generator of the waste and further concluded in accordance with the second sentence of K.S.A. 65-3418(a) that the title remained with the generator, thereby making the County liable for the closure and postclosure of the landfill.

K.S.A. 65-3402(k) defines "generator" to be "any person who produces or brings into existence solid waste." "Person" is defined as an "individual, partnership, firm, trust, company, association, corporation, individual or individuals having controlling or majority interest in a corporation, institution, political subdivision, state agency or federal department or agency." K.S.A. 65-3402(e). The district court recognized that the waste in the landfill was generated by the citizens of Marion County but reasoned that it would be "impractical if not impossible" to individually sue each citizen of the County whose waste was deposited. Based upon the evidence that most of the waste emanated from Marion County residents and upon the County's overall responsibility for waste disposal within its county, the district court concluded that the County was the generator of the waste.

The district court's conclusion that Marion County was the generator of the waste is not supported by the language of the statute. K.S.A. 65-3418(a) provides in the second sentence that title shall "remain the property of the generator," which contemplates that title remains in the party that originally had title. However, the evidence establishes that the majority of waste deposited in the landfill came from the citizens of the County, not the County itself. The difficulty of suing each citizen cited by the district court does not alter the fact that the County never had title to the waste in question.

In addition, for the second sentence of K.S.A. 65-3418(a) to operate, the waste must emanate from a "discrete source," a term not defined in the act. Webster's Ninth New Collegiate Dictionary 362 (1991) defines "discrete" as "constituting a separate entity:

individually distinct," "consisting of distinct or unconnected elements," or "taking on or having a finite or countably infinite number of values." Black's Law Dictionary 479 (7th ed. 1999) defines "discrete" as "individual; separate; distinct."

The waste deposited at the MCLI site was not from a discrete source but was a mixture of the waste generated by the citizens of Marion County. Once deposited and mixed together, it becomes homogenous and cannot be linked to a particular citizen. Thus, the waste is not from a discrete source and the provisions of the second sentence of K.S.A. 65-3418(a) do not apply.

According to the express provisions of K.S.A. 65-3418, the County was not the generator of the waste in the landfill and title could not, therefore, have remained with the County. Moreover, the solid waste did not emanate from a discrete source and the provisions of the statute do not apply. Accordingly, we conclude that the district court erred in its decision that the County was responsible for the closure and postclosure of the landfill under K.S.A. 65-3418(a).

## Nuisance

The district court granted summary judgment against the County on the additional basis that the dump site constituted a public nuisance. On appeal, the County argued that the evidence does not support the conclusion that a public nuisance existed. In the alternative, the County argued that assuming the existence of a nuisance, the County was not responsible for its removal. The County argued that the district court had no jurisdiction over the County based upon KDHE's failure to comply with the notice requirements of K.S.A. 12-105b.

"The standard of review for a motion for summary judgment is well established. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 60-256(c). On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Jackson v. U.S.D.* 259, 268 Kan. 319, 322, 995 P.2d 844 (2000).

"A public nuisance is an unreasonable interference with a right common to the general public, such as a condition dangerous to health, offensive to community moral standards, or unlawfully obstructing the public in the free use of public property." *State v. Deines*, 268 Kan. 432, 439, 997 P.2d 705 (2000) (quoting Black's Law Dictionary 1095 [7th ed. 1999]). "A public nuisance is one which annoys an entire community." *Delight Wholesale Co. v. City of Overland Park*, 203 Kan. 99, 102, 453 P.2d 82 (1969). The finding of a nuisance depends on numerous factors such as the "type of neighborhood, the nature of the thing or wrong complained of, its proximity to those alleging injury or damage, its frequency, continuity or duration, and the damage or annoyance resulting, and each case must necessarily depend on its particular facts and circumstances." *Culwell v. Abbott Construction Co.*, 211 Kan. 359, 365, 506 P.2d 1191 (1973).

The district court concluded that the site was a public nuisance because the final cover had not been applied and erosion was exposing the waste at the site. The court noted various toxic substances harmful to public health were detected on the site.

The KDHE argued that the County admitted that the site constituted a nuisance. For authority, the KDHE cites deposition statements made by County Commissioner Linda Peterson and the County's answer to the KDHE's petition. Peterson said in her deposition that the site constituted a "health hazard and nuisance." In the County's petition, it admitted that MCLI had not properly closed the landfill and that the site exists as an illegal site. Peterson's deposition answers and the answer to the amended petition do not amount to an admission. Peterson was asked to comment on whether the site constituted a nuisance hazard, not a nuisance. Further, it is not clear that Peterson is an expert in the legal definition of nuisance. Similarly, it is not clear the word "nuisance" was meant to have a legal definition rather than a layperson's definition.

It is undisputed that final cover has not been placed upon the site. On July 28, 1997, the KDHE sent a letter to Stephen Grosse indicating that there was evidence of erosion at the site which caused trash and litter to break through the surface. The letter

cited Kansas Administrative Regulation (K.A.R.) 28-29-121, which governs closure responsibilities for landfills and pointed out that MCLI had failed to complete the required closure activities required by the regulation. William Grosse acknowledged that 7.4 acres still needed final cover at a cost between $600,000 and $700,000.

Kirk Hoeffner, an environmental geologist with the KDHE, testified that a groundwater sampling at the site revealed chemical contaminants of 1,1 dichloroethane and chloroethane, however, he was unable to say that the levels detected violated any standards. The existence of the chemical contaminants at the site without further testimony fails to support the district court's determination that a nuisance existed. While the evidence demonstrates that K.A.R. 28-29-121, regarding the final cover of the landfill site, was not followed and chemical contaminants were found at the landfill site, these facts alone do not support a finding of nuisance at the site. Kansas law requires, in addition, that there be a condition dangerous to the health of the community; an unreasonable interference with a right common to the general public which annoys the entire community. *Deines*, 268 Kan. at 439. We, therefore, reverse the district court's summary judgment holding the County liable for closure and postclosure costs on the basis of a public nuisance.

### The County as Guarantor

The district court granted summary judgment to the KDHE, holding the County liable based upon its guaranty. More specifically, the court based its decision that the County guaranteed closure and postclosure costs upon the following four transactions: (1) County Commissioner DeForest's February 13, 1992, letter to the KDHE; (2) the journal entry settling *Grosse v. Marion County*, Marion County District Court Case No. 94-C-3; (3) the December 12, 1994, contract between the County and MCLI; and (4) the County's May 31, 1996, written guaranty.

To the extent this issue involves an interpretation of written documents, this court's standard of review is unlimited. *City of Topeka v. Watertower Place Dev. Group*, 265 Kan. 148, 153, 959 P.2d 894

(1988) ("The interpretation and legal effect of written documents are matters of law upon which our standard of review is unlimited."). Otherwise, the summary judgment standard of review, set forth above, is applicable.

### County Commissioner DeForest's February 13, 1992, Letter

The KDHE argued that the February 13, 1992, letter sent to William Anderson of the KDHE by Charles DeForest, the chairperson of the County Board, was a valid guaranty. DeForest wrote that the County Commission met with Charles Linn of the KDHE on February 10, 1992, concerning problems with the landfill site and the need for a County guaranty of closure and postclosure costs. In response and on behalf of the County, DeForest wrote to the KDHE, stating:

"The enclosed copies of the minutes of that meeting are intended to convey our guarantee that the landfill will meet [KDHE's] current closure and post closure fund regulations and allow for the landfill permit renewal."

The following summarizes the minutes of the meeting referenced in DeForest's letter:

"Charles Penner, Sanitarian, Don Jasperson, R & B Supv., Tommy Grosse and Steve Grosse, owner/operators of the landfill, and Charles Linn, Ks. Dept. of Health and Environment, met to review conditions at the landfill. Linn stated that it needed better cleaning and grading; that the tires needed to be picked up; that he wanted a commitment that it will be done before a license will be reissued; that someone must put closure funds—possibly the County.

"Linn recommended that the Planning Commission was an appropriate committee to address a revised solid waste plan; that a solid waste management committee should be established in every county; that the State would send representative to visit local committees.

"Linn advised that the County and the landfill contractor watch the operation closer, and maintain proper cover; that a commitment was needed from the County for closure funds; that the post closure and operation maintenance fund was Grosse's responsibility.

"Linn recommended a Letter of Resolution or guarantee from Marion County to commit funds to close the last acre or two; suggested that $7,500 would be sufficient.

"DeForest moved that Marion County would guarantee the closure of two or three acres, as the operator, Tommy Grosse, has given a commitment to bring the closure up to date. Marion County will guarantee the closure of any additional acreage necessary. Peterson seconded and the motion carried 2-0.

"Linn requested that a letter be transmitted to KDHE with a copy of the written minutes to confirm Marion County's commitment.

"Linn advised Grosse that the post closure fee is estimated at $40.00 per acre for mowing and maintenance; that the funds should be deposited annually in an interest bearing account over a 10 year period for the 20 acres involved in the landfill; can be withdrawn after it is determined that no more solid waste will be added. Advised that the pits should be closed as used and the closed pits should be properly maintained. Gross responded that the closed pit area would be in compliance within 30 days."

DeForest's letter expressed the County's guarantee that "the landfill will meet [the KDHE's] current closure and postclosure fund regulations." See K.A.R. 28-29-17a; K.A.R. 28-29-17b (both regulations revoked February 24, 2000). The County's guarantee was not limited to a specific amount even though the minutes of the meeting reflected an estimate of $7,500. Such a written guarantee was also given to assure the County of the continued operation of the landfill to serve the citizens of its county. The guarantee contemplated a permit to continue governed by the provisions of K.S.A. 65-3407(h)(2). We conclude that the letter guaranteed the closure and postclosure operations of the site and supports the district court's conclusion that the County is responsible as guarantor. Without the guaranty, the continued operation of the landfill would have been jeopardized. The County cannot enjoy the benefits of the KDHE, having allowed the landfill to continue serving Marion County citizens without accepting the responsibility that came with that benefit.

### Journal Entry Regarding Closing Costs

The KDHE argued that the County, in the journal entry settling a case filed by Stephen and William Grosse, d/b/a/ MCLI, against the County, unconditionally guaranteed the closing costs of the site. Evidence of the underlying facts of the case are not contained in this record. The August 31, 1994, journal entry approving the settlement between William Grosse and Stephen Grosse, doing business as MCLI, and the County, provides:

"THEREUPON counsel for the Petitioners and the Respondent announce to the Court that they have agreed to dismiss this case without prejudice and that the parties have entered into a settlement of their differences such that the Re-

spondent [County] shall be responsible for providing financial assurance for the closure of the Marion County Landfill and pay for post closure costs."

The district court found that the County unconditionally agreed on August 24, 1994, to guarantee the closure and postclosure of the landfill. We agree that the journal entry demonstrates the County's responsibility for the closure and postclosure costs.

### The December 12, 1994, Contract

The KDHE argued that the County is bound to pay for the closure and postclosure costs based upon the December 12, 1994, contract between the County and MCLI along with the May 31, 1996, written guaranty agreement.

The December 12, 1994, contract was signed by all three County commissioners and Stephen Grosse as president of MCLI. In the contract, the County agreed to guarantee the closure and postclosure costs:

"5.4 Closure and Post-Closure Maintenance of Facility. County shall guarantee [MCLI's] construction and installation of all closure and post-closure systems at the Facility, [MCLI's] maintenance of said closure and monitoring systems at the Facility, [MCLI's] performance of all necessary post-closure monitoring at the Facility and [MCLI's] performance of any and all corrective action or actions required by KDHE."

The contract placed the primary responsibility for the closure and postclosure costs on MCLI:

"19.0 Closure and Post-Closure. [MCLI shall] be responsible for obtaining a closure cost estimate for Facility, which is based upon [MCLI's] assumption of all responsibility for closure, and post-closure maintenance and monitoring at the Facility. The closure cost estimate shall be based upon the costs estimated to close the Facility according to the closure plan required by the specifications for the Facility and by applicable state and federal law. [MCLI] shall furnish evidence to County that the cost-estimate has been approved by [the KDHE]. [MCLI] shall indemnify and hold County harmless for all costs incurred by County, incident to section 5.4 of this agreement, which costs are incurred for closure cost estimates, closure, or post-closure monitoring and maintenance of the Facility, or any corrective action agreed to by [MCLI] or otherwise ordered by KDHE."

The contract also provided that any transfer of the landfill property would be subject to the County's rights under the contract.

"2.12. Facility Ownership.

"2.12.1 <u>Covenants</u>. Within 60 days of the date this agreement is executed, [MCLI] shall deliver to County, a duly recorded covenant with respect to the Facility, which covenant shall have a term which is at least as long as the term of this agreement, with the assumption that the same shall be in a form approved by County. Such covenant, as recorded, shall be attached to this agreement and incorporated herein by reference. Said covenant shall run with the land and shall touch and concern the Facility and any other property used for cover/liner materials at the Facility, if any. Said covenant shall provide:

"(a) Any transfer of any interest in the Facility, or other property used for cover/liner materials, and any liens or other encumbrance voluntarily placed or allowed to be placed against the Facility or such other property shall be inferior and subordinate to the claims and rights of County under this agreement; and

"(b) Subject to the provisions of subsection 2.11.2, the Facility, and any other property used for cover/liner materials shall be kept free of all liens and mortgages or other such encumbrances which would prevent Contractor from performing according to the terms of this agreement, or which would reasonably diminish County's remedies against Contractor, its subcontractors, the Surety or any other guarantor of Contractor's performance according to the terms of this agreement.

"Contractor covenants and warrants that it owns the Facility and has the right to use the Facility in the manner contemplated by this agreement and the use of the Facility as contemplated will conform to presently existing federal and state land use, environmental and other applicable laws, including but not limited [to] the applicable solid waste management plan for [the County], as amended, and the applicable provisions of the Central Kansas Regional Solid Waste Management Plan."

The record demonstrates that the consideration for the County's guaranty in the December 12, 1994, contract was the KDHE's continuing permission for the operation of the landfill.

### The May 31, 1996, Written Guaranty

As a last ground for holding the County liable under a guarantee for the closure and postclosure costs, the KDHE cites the May 31, 1996, written guaranty made by the County. The May 31, 1996, guaranty was signed by the three commissioners of the County and provided as follows:

"1. Subject to the provisions of ¶ 6 below, the County agrees that in the event [MCLI] fails to construct or install closure and post-closure and monitoring systems at the Facility, or fails to maintain any such closure and monitoring systems at the Facility, or fails to perform all necessary post-closure maintenance and monitoring at the Facility, or fails to perform any corrective action or action as required by the agreement or KDHE the County, in the name and stead of

[MCLI], shall so perform as mandated by KDHE in the amount of the closure and post-closure cost estimates as specified in the operating record for the Facility, at the time the corrective action is mandated by KDHE.

. . . .

"5. The County agrees to remain bound by this Guaranty for so long as [MCLI] must comply with the applicable financial assurance requirements for the Facility, except that the County may cancel this Guaranty by sending notice by certified mail to both the Contractor and KDHE. Such cancellation shall become effective no earlier than 120 days after receipt of such notice by both KDHE and the Contractor as evidenced by return receipts for such notice.

"6. In the event the County cancels this Guaranty, as set forth in paragraph five (5) above, and [MCLI] thereafter fails to provide alternative financial assurance as otherwise required by law or obtain written approval of such assurance from KDHE within 90 days after receipt of notice of cancellation is received by [MCLI], the County shall nonetheless not be obligated to provide alternative financial assurance, or to otherwise remain bound to KDHE pursuant to this Guaranty; provided, that such cancellation of this Guaranty arises out of [MCLI's] failure to perform those provisions of the agreement pertaining to actions required to be taken before closure of the landfill or provisions concerning ownership of the facility.

"7. This Guaranty shall become effective upon the express written acceptance of this Guaranty by KDHE."

The County argued it justifiably terminated the May 31, 1996, guaranty because MCLI breached the terms of the December 12, 1994, contract. We disagree. With respect to the failure of MCLI to secure a permit for the site, MCLI secured a temporary permit on June 11, 1996, which permitted MCLI to operate the landfill until October 9, 1996. If MCLI's delay in obtaining a permit is contrary to the contract terms, it is dubious how such a delay was prejudicial to the County. MCLI collected waste from the County's constituents throughout the term of the contract, which was what the County bargained for.

Turning to the failure of MCLI to file a restrictive covenant, MCLI's transfer of the perimeter of the west 80 acres to MSW impaired MCLI's own ability to perform the closure and postclosure procedures for which it had primary responsibility. As the County was called upon to perform when MCLI could not, the County had indemnification rights against MCLI and, therefore, access to MCLI's assets which should have included the entire west

80 acres. Unfortunately, MCLI, knowing its responsibilities, transferred a bulk of the property to MSW, thereby leaving the County with an insufficient indemnification remedy. However, the remedy was not to relieve the County from its contractual obligations. As we discuss below, the district court erred in failing to join MSW and the MCLI shareholders. Had the district court properly joined MSW and the MCLI shareholders and permitted the County to pursue its indemnity rights against MCLI, the County's interest would not have been impaired.

The County argued that MCLI's attempted sale to BFI breached the December 12, 1994, contract permitting the County to cancel its guaranty. This action on MCLI's part did not prejudice the County's rights or affect the County's responsibilities, and the contract's disclaimer of third-party beneficiaries does not provide an escape for the County. The nature of the County's guaranty dictates that it would benefit the KDHE upon MCLI's default.

The May 31, 1996, guaranty acknowledged the disagreement MCLI and the County were having over the December 12, 1994, contract. The County's use of the breach of the contract as a means of invalidating the guaranty is unpersuasive.

The County's argument is that the actions of MCLI in transferring the perimeter of the landfill site to MSW, along with the transfer by the MCLI shareholders of the east 80 acres to MSW, required the County to incur additional costs in performing the closure and postclosure procedures. However, under the facts of this case, the impairment of the County's rights as guarantor does not affect the fundamental question of whether the County is liable for the closure and postclosure as guarantor. We deal with the County's subsequent rights as guarantor later in this opinion.

In June 1996, the KDHE could have ordered the immediate closure of the site. The County's guaranty was an important factor in the KDHE's decision to allow MCLI to continue its operation. By continuing to permit MCLI to accept waste from Marion County citizens, the KDHE's temporary permit allowed waste to continue to pile up at the site, exacerbating the landfill situation. At the same time, the KDHE was permitting MCLI to provide the County with a valuable service—final storage for the waste gen-

erated by its constituents. Under these circumstances, we find the County made a valid guaranty which it now must honor.

### The County's Release from Its Guaranty Based upon the Settlement Agreement

The County argues the district court erred when it failed to find the settlement agreement between MCLI and the KDHE released the County from liability for the closure and postclosure costs associated with the site. The KDHE reached a settlement agreement with MCLI and filed it with the court on October 31, 2001. In the agreement, MSW consented to the jurisdiction of the court in order to obligate itself to perform the terms of the agreement between the parties.

To the extent this issue requires an interpretation of the settlement agreement between the KDHE and MCLI and a determination of its effect, the standard of review is unlimited. See *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213 (1998).

The KDHE's settlement with MCLI and MSW provided for three contingencies. First, if the KDHE was unsuccessful with its claims against the County, MSW agreed to provide MCLI and the KDHE with the necessary soil at no charge for the closure and postclosure procedures. Second, if the KDHE secured judgment against the County, MSW agreed to sell soil to the County at the current market value for the purposes of completing the required closure and postclosure maintenance. Third, if KDHE secured judgment against the County and the County provided MSW with a conditional use permit (CUP) for MSW to operate a landfill, MSW agreed to provide the County with the necessary soil at no charge for the closure and postclosure procedures.

The KDHE also argued that the County waived its defense that the transfer of land from MCLI to MSW impaired its collateral. The KDHE argued that the County had not proved that the December 12, 1994, contract guaranteed that the County would get free dirt for cover, or that the County would have any interest or collateral in the property of the landfill. However, the contract contemplated that the primary responsibility for closure and po-

stclosure lay with MCLI. Had MCLI fulfilled its responsibilities under Kansas regulations and as contemplated in the contract, it would have utilized resources from the entire site. MCLI and the MCLI shareholders have sold a bulk of the property to MSW and now claim that it is financially unable to fulfill its obligations. The KDHE's solution is to construct a settlement agreement in which resources are sold to the County for it to perform on its guaranty. Thus, a solvent MCLI would have used the entire site to perform the closure and postclosure operations, but following the KDHE's settlement agreement with MCLI, in addition to the land transfers between the corporation primarily responsible (MCLI) and the corporation owned and operated by the attorney for the corporation primarily responsible (MSW), the County must, in order to fulfill its guaranty responsibilities, purchase soil to the financial benefit of MSW.

The KDHE's assertion that the County's access to the entire site is not helpful for carrying out the closure and postclosure operations is particularly disingenuous in light of its original petition in this case, which asked for an injunction to bar the transfer of land from MCLI to MSW. The petition specifically notes that the "available soil for cover purposes would be separated from the area where it is needed to fulfill the obligation [MCLI] has to provide cover for the waste." The KDHE attempted throughout this litigation to join MSW as late as 2 months before it reached a settlement agreement with MCLI and MSW, which prevented the free use of the entire west 80 acres for the performance of the closure and postclosure requirements. On appeal, KDHE argued the County should not complain that it must buy soil from MSW, which, according to the County, would have substantially increased the cost of performing under the guaranty by $100,000.

While the district court's resolution of this case was unfair to the County, the release of the County's liability as guarantor is not the proper remedy. Pursuant to its guaranty, the County will be called upon to perform the necessary closure and postclosure procedures, thereby giving the County a claim against MCLI. We are concerned about the transactions that occurred between MCLI, the shareholders of MCLI, and MSW. Therefore, we next consider

those transactions to determine whether the district court properly considered the County's rights as guarantor.

### The Statute of Limitations as a Bar to the Action against MSW

The County argued that the district court erred in determining that its claims against MSW were time barred. In the County's August 31, 2001, motion to join MSW, it argued that MSW was a contingently necessary party pursuant to K.S.A. 60-219 because the title to the real estate was subject to the litigation. The County argued that the lawsuit imposed burdens upon the real property MSW claimed to own. According to K.S.A. 60-219(a), a party shall be joined if "complete relief cannot be accorded in his absence among those already parties." We review the district court's failure to join MSW with an abuse of discretion standard of review. See *Harms v. Burt*, 30 Kan. App. 2d 263, 268, 40 P.3d 329, *rev. denied* 274 Kan. 1111 (2002).

The County challenged the effectiveness of the transfer and specifically alleged that the transfer was done without securing fair and reasonable compensation for the property. The motion also asserted that MSW was fully aware of MCLI's obligations at the time of the transfer. We also note that the district court found at one point that there may be indicia of constructive fraud in this case. At the hearing on the KDHE's motion for summary judgment as to the County, the County argued that the transfer of the acreage to MSW was done collusively to avoid the liability of MCLI. As this case is best viewed in terms of a fraudulent transfer theory, we consider whether the district court erred in refusing to join MSW.

The badges of fraud are as follows: (1) a relationship between the grantor and grantee, (2) the grantee's knowledge of litigation against the grantor, (3) insolvency of the grantor, (4) a belief on the grantee's part that the contract was the grantor's last asset subject to a Kansas execution, (5) inadequacy of consideration, and (6) consummation of the transaction contrary to normal business procedures. *Koch Engineering Co. v. Faulconer*, 239 Kan. 101, 105, 716 P.2d 180 (1986).

In this case, MSW is a creature of MCLI's attorney, Mills. There is an obvious relationship between MCLI and MSW. At the time of the transfer, Mills was aware of the order to MCLI to complete closure of the landfill. The transfer of the west 80 acres occurred less than 2 years after KDHE's original order requiring MCLI's performance of the closure and postclosure requirements. MCLI is substantially insolvent—the record shows that MCLI had assets of $1,061. The sale of real estate appeared to be part of a scheme to deplete assets of MCLI through the land transfers in addition to distributions to shareholders. The record suggests the consideration was past legal fees generated by Mills—a question of fact upon remand. Finally, the transfers between MCLI and the MCLI shareholders and MSW appear to be unusual transactions.

While we do not definitively decide the issue of whether the transfer by MCLI of the west 80 acres to MSW was a fraudulent transfer, the record on appeal suggests that the district court should have permitted the County to pursue its claims against MSW. The substance of this issue is one for the district court upon remand.

We hold that the district court erred in failing to join MSW to the lawsuit. We, therefore, reverse the district court on this matter and remand the case for further proceedings. The district court cited the statute of limitations as the grounds for refusing to join MSW. However, the KDHE attempted to enjoin the transfer to MSW within months after the transfer occurred. The district court erred by failing to grant the injunction. Further, MSW was aware of the KDHE's attempts to enjoin the transfer. Therefore, two rationales for the statute of limitations—to put the defendants on notice of potential claims and to prevent the plaintiffs from delaying bringing actions—would not be served by using the statute of limitations as a bar. See *Waltrip v. Sidwell Corp.*, 234 Kan. 1059, 1063, 678 P.2d 128 (1984). It is the district court's failure to join MSW, not the delay on the part of KDHE or the County, that caused the delay in joining MSW.

Piercing the Corporate Veil

The County argues its claim against the officers, stockholders, and directors of MCLI was not barred by K.S.A. 17-7101(b).

On August 31, 2001, the County moved the court for permission to file a third-party petition against the shareholders of MCLI. A copy of the proposed petition was attached to the motion, which actually named the shareholders of MCLI along with MSW. As to the shareholders of MCLI, the County argued that the MCLI shareholders failed to follow statutes and regulations and improperly distributed funds, leaving MCLI unable to fulfill its responsibilities as to the closure and postclosure operations. The proposed petition alleged that the shareholders failed to operate MCLI as a corporate entity and that the court should pierce the MCLI corporate veil.

The district court in its order filed October 31, 2001, failed to consider the County's arguments that the corporate entity should be disregarded. The court decided the issue based upon K.S.A. 17-7101(b):

"The court finds that the claim[s] against the officers, stockholders and/or directors of MCLI are barred by K.S.A. 17-7101(b) and that the claim against MSW is untimely and barred by the Statute of Limitations. Thus, the Motion of [the County] to file an amended pleading against MCLI Stockholders and against MSW is denied."

K.S.A. 17-7101(b) provides that "[n]o suit shall be brought against any officer, director or stockholder for any debt of a corporation of which he is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied." However, this rule need not be followed when compliance with that statute would be useless. *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 795, 473 P.2d 33 (1970) (construing a substantially similar statue). In this case, MCLI admittedly had $1,000; thus, compliance with K.S.A. 17-7101(b) would be useless and only "have added delay and expense." 205 Kan. at 795. Given the relatively insignificant assets held by MCLI compared with its liabilities, compliance with the 17-7101 provisions requiring a lawsuit against the corporation is unnecessary under the facts of this case. This is not a case where the corporation has not even been joined—MCLI was an initial party to this lawsuit. Further, MCLI's assets of $1,000 would be insufficient to satisfy its obligations.

On remand, the district court should consider the following elements before reaching the decision to pierce the corporate veil:

"(1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud." *Speer v. Dighton Grain, Inc.*, 229 Kan. 272, 279, 624 P.2d 952 (1981).

Some of the factors are inapplicable in this case. There is no evidence a dominant stockholder siphoned funds from the corporation. However, the record in this case overwhelmingly supports the finding that the use of the corporate entity promoted injustice or fraud. The County made its most persuasive argument with respect to this last factor. In this factually difficult, convoluted case, it appeared transactions were made with the result that the County was faced, not as the party primarily responsible but as guarantor, with the prospect of being responsible for the closure and postclosure costs of the landfill. The County made a credible case that the MCLI veil should be pierced.

MCLI shareholders admitted that they knew of the liabilities that MCLI was facing with the closure and postclosure costs. Nevertheless, the corporation continued to make distributions throughout 1996. MCLI distributed $14,000 to shareholders in 1995 and $70,000 to shareholders in 1996. To a certain extent, these distributions are traceable to the sale of part of the west 80 acres to MSW. Without the transfer, this property would have been available to MCLI to complete its closure and postclosure obligations.

The decision of piercing the corporate veil is a factual question for the district court to determine upon remand. Factual questions remain for the district court's disposition.

## Conclusion

Our review of this record on appeal requires us to reverse the case and remand for further proceedings. We hold (1) the County does not have title to the waste deposited at the landfill site pur-

suant to K.S.A. 65-3418(a); (2) the County is not liable for abating any nuisance at the landfill site; (3) the County is liable, as guarantor, for the closure and postclosure requirements; (4) the district court erred in refusing to join MSW to the lawsuit to consider whether the transfer of the west 80 acres should be enjoined and subject to the closure and postclosure operations; and (5) the district court erred by refusing to join the shareholders of MCLI to consider the County's claim that MCLI's corporate form should be disregarded.

Affirmed in part, reversed in part, and remanded with directions.

ABBOTT and NUSS, JJ., not participating.

BRAZIL, S.J., and DAVID S. KNUDSON, J., assigned.