No. 97,494

KENNETH E. UNRUH AND ROBERT K. CARTER, *Appellees*, v.
PURINA MILLS, LLC, *Appellant*.

(221 P.3d 1130)

Opinion filed December 11, 2009.

*Matthew M. Merrill,* of Brown & Dunn, P.C., of Kansas City, Missouri, argued the cause, and *Julie J. Gibson,* of the same firm, was with him on the briefs for appellant.

*Randall K. Rathbun,* of Depew Gillen Rathbun & McInteer LC, of Wichita, argued the cause, and, *Jack Scott McInteer,* of the same firm, was with him on the briefs for appellee.

*Per Curiam:* On review of the judgment of the Court of Appeals in *Unruh v. Purina Mills,* No. 97,494, unpublished opinion filed June 27, 2008, Purina Mills, LLC, appeals from the jury verdict and award of attorney fees entered against it in a breach of warranties and Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.,* action involving feed supplements supplied to two cattle ranchers.

A comparison with the record on appeal establishes that the statement of facts contained in the decision of the Court of Appeals is accurate and sufficient for purposes of review, as follows:

"Kenneth E. Unruh and Robert K. Carter are neighboring cattle ranchers. In August 2003, Unruh attended a seminar conducted by Purina Mills, LLC (Purina), to promote a self-feeding system designed to reduce labor, save time, permit cattle to perform to their highest genetic ability, and boost total net return. The system used a creep feeder that distributed a product known as '2HL,' which supplements a diet of grass or hay. 2HL is a mixture of corn, sunflower seed, cottonseed, and soybeans that varies from batch to batch. Purina calculates the cheapest mixture based on current costs that provides the promised nutrition content. This technique—the least cost formula—has been used in the animal feed industry for the past 50 years. Each bag of 2HL has a tag that guarantees the mixture contains a minimum amount of certain ingredients.

"Unruh was impressed with the system and told Carter about it. As a result, Unruh and Carter agreed to purchase the system. They received their first load of 2HL in late November 2003. They had no initial problems with the system other than regulating the flow of feed from the feeder. Tim Peissig, Purina's district manager, and Kent Hansen, the owner of the local retail distributer, observed Unruh's cows 2 weeks later and concluded that the system was working properly. However, Hansen noted that Unruh had no hay and very little grass available to his cattle and reminded Unruh to provide the cows with an ample supply.

"When Unruh and Carter received their second load of 2HL in late December 2003, they noticed that the feed had a different color than the first batch and was hard and oily in texture. They had to break the feed apart with crowbars and claw hammers to make the product edible for their cows. Over the next several weeks, Unruh and Carter continued to break up the 2HL in the feeders daily, but their cattle's consumption of the feed dropped and the cows began losing weight.

"In February 2004, Unruh notified Purina of these problems. Peissig and Hansen returned to Unruh's ranch, and Hansen again noted the lack of hay for Unruh's cows. Testing of the feed revealed that Purina had changed the formula for 2HL between the first and second batch. Sunflower meal increased from 5% to 15% and cottonseed meal decreased from 10% to 0%. Nevertheless, the mix met Purina's nutrition specifications.

"Peissig and Hansen attempted to solve Unruh's problems by delivering to Unruh a batch consisting of 80% 2HL and 20% corn. Pending delivery of this new batch, Unruh fed his cows as much hay as possible as Peissig had suggested. Carter also fed his cows more hay as soon as they began to lose weight.

"When Peissig and Hansen returned a couple of weeks later, nearly a dozen of Unruh's and Carter's cows had died and others aborted their calves and had to be sold at a loss.

"In August 2005, Unruh and Carter filed a suit against Purina claiming damages for breach of express and implied warranties. The court later granted them leave to amend their petition to include claims for breach of the Kansas Consumer Protection Act (KCPA), K.S.A. 50-625 *et seq*. Unruh and Carter never filed and served an amended petition which included their KCPA claims, though a pro-

posed amended petition was attached to their motion for leave to amend. The claim was later set forth in the pretrial order.

"Purina moved to sever for trial the separate claims of Unruh and of Carter. The district court denied the motion. Purina also moved in limine to prohibit Unruh and Carter from expressing lay opinions on causation. In overruling the motion, the [judge] observed:

" 'Mr. Carter and Mr. Unruh, their profession is in raising cattle, and in that respect an integral part of that business is feeding cattle and putting weight on cattle so that they can maximize their profits when these cattle are sold. And doing that kind of business, they acquire certain knowledge about cattle and what they eat and what they're fed, and I think that they are qualified to offer testimony in that regard.'

"At trial, Bret Galyardt, a Purina employee engaged in quality control, testified that cold weather and other variables may affect the flowability of feed, though not to the extent that a rancher should be expected to have to break apart the feed with a hammer or a crowbar. Peissig testified that he was aware that 2HL had flowability problems in very cold weather, but he did not inform Unruh and Carter of this because it did not happen very often.

"Unruh testified that the switch to 2HL did not reduce his labor or time or ensure his cattle would perform to the best of their genetic ability. To the contrary, he believed that his cows' inability to feed on the 2HL due to the flowability problem resulted in many of them dying or aborting their calves. Nevertheless, he did not disagree with the statement that Purina wanted him to succeed in the use of 2HL. He testified that the use of 2HL caused the death of 5 registered Angus cows, the reduced value of 14 other cows, and the loss of calves due to 59 cows aborting. Unruh claimed damages of $50,900.

"Carter's testimony was, for the most part, consistent with that of Unruh. He testified that the use of 2HL caused him to lose 4 cows, and he had to sell 16 other cows at a loss. He also claimed he lost 16 calves due to cows aborting. He claimed damages of $17,600.

"James Forcherio, Ph.D., Purina's expert, opined that Unruh's and Carter's cattle must have been starving to lose the amount of weight they experienced within the relevant 30-day period. He attributed the loss to the lack of adequate forage, not the second batch of 2HL. He testified that 2HL is only a supplement to help cows gain weight and should be provided in addition to an otherwise adequate food supply. In his opinion, Unruh's and Carter's cows would not have lost as much weight as they did, even when supplied with a bad batch of 2HL, if they were otherwise provided with an adequate food supply.

"The jury returned a verdict in favor of Unruh and Carter for breach of implied warranties of merchantability and fitness for a particular purpose, breach of express warranty, and violation of the KCPA. On Unruh's claims the jury apportioned 20% of the fault to Unruh and 80% to Purina and found his damages to be $47,550. On Carter's claims the jury apportioned 5% of the fault to Carter and 95% to Purina and found his damages to be $17,125.

"After dismissing the jury, the district court discovered that the caption on the jury verdict forms incorrectly listed the defendant as 'State Farm Mutual Automobile Insurance Company' rather than Purina. The court ultimately found this to be harmless and denied Purina's motion for new trial or, in the alternative, for judgment notwithstanding the verdict. The court granted Unruh's and Carter's motion for attorney fees based upon their successful KCPA claims." *Unruh,* slip op. at 2-6.

Purina took a timely appeal. The Court of Appeals affirmed in part and reversed in part, finding that insufficient evidence supported the KCPA claims and the resulting award of attorney fees. Slip op. at 18-19. Judge Malone dissented in part and would have affirmed the district court on all issues. Slip op. at 23 (Malone, J., concurring and dissenting). Both parties filed petitions for review. The plaintiffs sought review of a ruling relating to the definition of willfulness under the KCPA. Purina sought review of rulings relating to the jury verdict form and the testimony of the plaintiffs on causation. This court granted review on all issues. See Supreme Court Rule 8.03(g)(1) (2009 Kan. Ct. R. Annot. 66); *Troutman v. Curtis,* 286 Kan. 452, 457, 185 P.3d 930 (2008) (on granting review without explicit limitation, Supreme Court may review all issues presented to and decided by the Court of Appeals).

## I. JOINDER

The district court joined Unruh's and Carter's claims in a single cause of action. Purina argues that joinder constituted reversible error because Unruh and Carter initially stated different theories of causation; they engaged in different farm management practices; and Carter had to rely on evidence introduced by Unruh to support his claims of misrepresentation. The Court of Appeals found the district court did not abuse its discretion in joining the claims. *Unruh,* slip op. at 15-18.

The standard of review for a district court decision to consolidate cases for trial is abuse of discretion. See *State ex rel. Graeber v. Marion County Landfill, Inc.,* 276 Kan. 328, 352, 76 P.3d 1000 (2003) (decision not to join parties reviewed under abuse of discretion standard); *Tuley v. Kansas City Power & Light Co.,* 252 Kan. 205, 217, 843 P.2d 248 (1992) (decision whether to join parties in class action reviewed under abuse of discretion standard);

*Loucks v. Farm Bureau Mut. Ins. Co.*, 33 Kan. App. 2d 288, 302, 101 P.3d 1271 (2004), *rev. denied* 279 Kan. 1006 (2005) (decision not to consolidate cases for trial reviewed under abuse of discretion standard).

K.S.A. 60-220(a) provides in relevant part for permissive joinder of parties as plaintiffs

"if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. . . . A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded."

K.S.A. 60-220(b) provides that the district court may order separate trials in order to "prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom [the party] asserts no claim and who asserts no claim against [that party]" and in order to "prevent delay or prejudice."

As the Court of Appeals noted, Unruh and Carter raised cattle on adjoining ranches and used similar feeding practices. Both purchased feed supplements from Purina, and both suffered losses to their cattle. They raised the same claims against Purina. Although Carter testified in a deposition that he believed the nutritional content of the Purina supplement was the cause of his losses, he testified at trial that the clumping and poor flow were the problems resulting in the losses.

The underlying facts and the theories at trial were substantially the same, and the statutory requirements for joinder were satisfied. Even if Carter "needed to ride the coattails of Unruh's evidence" and in fact bootstrapped his claims onto Unruh's, the Court of Appeals correctly noted that Purina could have expected Carter to present the same witnesses and theories that Unruh did to support his case. Slip op. at 17.

The Court of Appeals concluded: "Rather than causing delay or unnecessary expense, the consolidation of these claims for trial had the exact opposite effect. Separate trials would have caused considerabl[e] delays and caused the parties and the court to waste considerable time and expense in the presentation of redundant testimony and exhibits." Slip op. at 17-18.

The Court of Appeals opinion accurately states the facts and reaches the correct conclusion. The district court did not abuse its discretion in joining the plaintiffs' cases for trial. We affirm on this issue.

## II. SUFFICIENCY OF THE PLEADINGS

Purina next argues on appeal that the plaintiffs' initial petition did not plead a cause of action under the KCPA; although the district court gave the plaintiffs leave to amend their petition, they failed to do so, and the KCPA claims were erroneously submitted to the jury. The Court of Appeals noted that the pretrial order stated claims under the KCPA, Purina did not make a timely objection to the order, and the issue was not properly preserved for appeal. See *Unruh*, slip op. at 9-10. The analysis by the Court of Appeals is correct.

Whether a pleading is sufficient to state a cause of action is a question of law. See *Tuggle v. Johnson*, 190 Kan. 386, 390, 375 P.2d 622 (1962); *Ewing v. Pioneer Nat'l Life Ins. Co.*, 158 Kan. 371, 374, 147 P.2d 755 (1944). Errors in law are subject to unlimited review on appeal. See *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1271, 136 P.3d 457 (2006).

Under notice pleading, the petition is not intended to govern the entire course of the case. Rather, the pretrial order is the ultimate determinant as to the legal issues and theories on which the case will be decided. *Halley v. Barnabe*, 271 Kan. 652, 656-57, 24 P.3d 140 (2001). The pretrial conference order, filed June 14, 2006, stated as the first issue of fact: "Did the defendant engage in deceptive acts or practices under the Kansas Consumer Protection Act?" The pretrial order supersedes any pleadings and has the effect of amending the pleadings to conform to it. K.S.A. 2008 Supp. 60-216(e); *Bob Eldridge Constr. Co. v. Pioneer Materials, Inc.*, 235 Kan. 599, 606, 684 P.2d 355 (1984); *Knowles v. Fleetwood Motorhomes of California, Inc.*, 40 Kan. App. 2d 573, 578, 194 P.3d 38 (2008);

If a party has an objection to a pretrial order, the party must file the objection in writing with the district court. Supreme Court Rule 140(f) (2008 Kan. Ct. R. Annot. 220). A party generally must

make a timely objection to a district court ruling in order to pre-serve an issue for appeal. See *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006); *State v. Anthony*, 282 Kan. 201, 206, 145 P.3d 1 (2006); *Price v. Grimes*, 234 Kan. 898, 901, 677 P.2d 969 (1984).

The pretrial order sufficiently stated the plaintiffs' claims under the KCPA, and the order superseded any petitions or amended petitions that the plaintiffs may have filed. The KCPA claims were properly submitted to the jury, and we affirm on this issue.

### III. EXPERT TESTIMONY

Prior to trial, Purina filed a motion in limine seeking to prevent the plaintiffs, Unruh and Carter, from testifying that the feed sup-plement caused the losses to their cows. The trial court ruled that Unruh and Carter could testify to causation based upon their ex-perience as cattle ranchers. At trial, Purina did not object to the testimony of Unruh and Carter on the issue of causation. To the Court of Appeals, Purina argued that the plaintiffs should have been required to present expert testimony on the issue of causa-tion. The Court of Appeals found that Purina had failed to preserve an objection to the plaintiffs' testimony at trial:

"At trial, Purina raised an objection based upon the economic loss doctrine but failed to make a contemporaneous objection to the testimony on causation. Not-withstanding the adverse ruling on causation at the hearing on Purina's motion in limine, to preserve the issue for appeal Purina had to object to the testimony at trial. See *Fitzpatrick v. Allen*, 24 Kan. App. 2d 896, 902, 955 P.2d 141, *rev. denied* 264 Kan. 821 (1998). Further, objecting on one ground at trial does not preserve a different objection on appeal. 24 Kan. App. 2d at 903. Purina never objected at trial to the causation testimony of Unruh and Carter. Its objection on a wholly separate and distinct ground, the economic loss doctrine, did not preserve the issue for appeal. Accordingly, the causation issue is not properly before us." *Un-ruh*, slip op. at 15.

On appeal to this court, Purina attempts to avoid the failure to register a contemporaneous objection by arguing that the plaintiffs did not present any causation testimony. Purina maintains the tes-timony cited by the Court of Appeals pertained to damages, not to causation, and consequently, Purina could not have objected to causation testimony and did not fail to preserve the issue for ap-

peal. In its initial brief, however, Purina argued that it was error for the district court to allow the plaintiffs to testify relating to causation.

An appellate court reviews a trial court's decision on a motion in limine under the abuse of discretion standard. *Gerhardt v. Harris*, 261 Kan. 1007, 1010, 934 P.2d 976 (1997). When the trial court grants or denies a motion in limine and the evidence is introduced at trial, the moving party must object at trial to the admission of the evidence to preserve the issue for appeal. *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 470, 124 P.3d 57 (2005); *Fitzpatrick v. Allen*, 24 Kan. App. 2d 896, 902, 955 P.2d 141, *rev. denied* 264 Kan. 821 (1998).

We have thoroughly reviewed the record on appeal and find that the Court of Appeals was correct in ruling that Purina failed to preserve an objection on this issue. The matter is not properly before us. We affirm the Court of Appeals on this issue.

## IV. KANSAS CONSUMER PROTECTION ACT

The Court of Appeals majority found that willful conduct under the KCPA requires proof of intent to harm the consumer. *Unruh*, slip op. at 11. The Court of Appeals then found that the evidence did not support a finding of intent to harm. Slip op. at 13. Having found that the claim under the KCPA was not supported, the Court of Appeals majority reversed the award of statutory attorney fees. Slip op. at 18-19.

In his concurring and dissenting opinion, Judge Malone questioned the majority's statutory construction but concluded that the record contained sufficient evidence that Purina intended to harm its customers. Slip op. at 20-21, 23 (Malone, J. dissenting in part).

Unruh and Carter appeal from the Court of Appeals' finding that willful conduct requires proof of intent to harm.

Interpretation of a statute is a question of law over which this court has unlimited review. *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, 1031, 181 P.3d 549 (2008). The fundamental rule governing interpretation of statutes is that the legislature's intent governs if this court can ascertain that intent. The court presumes that the legislature expressed its intent through the

language of the statutory scheme. *In re G.L.V.*, 286 Kan. 1034, 1040-41, 190 P.3d 245 (2008).

When the statutory language is plain and unambiguous, the courts therefore do not need to resort to statutory construction. 286 Kan. at 1041. "A statute should not be read to add that which is not contained in the language of the statute or to read out what, as a matter of ordinary language, is included in the statute. [Citation omitted.]" *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 521, 154 P.3d 494 (2007).

Only when the language of a statute is unclear or ambiguous does the court move to the next analytical step, applying canons of construction or relying on legislative history to construe the statute in accord with the legislature's intent. *In re K.M.H.*, 285 Kan. 53, 79, 169 P.3d 1025 (2007), *cert. denied* 172 L. Ed 2d 239 (2008).

K.S.A. 50-626(b)(3) defines as an unlawful deceptive act or practice "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Court of Appeals majority concluded that the word "willful" means something more than "intentional"; it must also include an "intent to harm the consumer." *Unruh*, slip op. at 11. It reached this conclusion based on two factors.

First, in 1991, the legislature substituted the word "willful" for the word "intentional" in both K.S.A. 50-626(b)(2) and in K.S.A. 50-626(b)(3). L. 1991, ch. 159, sec. 2. In 1993, it amended K.S.A. 50-626(b)(3) a second time to substitute "willful" for another use of "intentional" in that subsection. L. 1993, ch. 177, sec. 1. Because the appellate courts presume that the legislature does not intend to enact useless or meaningless legislation, see *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 631, 132 P.3d 870 (2006), the Court of Appeals concluded that the legislature intended the word "willful" to mean something more restrictive than the word "intentional." *Unruh*, slip op. at 11.

Second, the Court of Appeals looked to PIK Civ. 3d 103.04, which defines "willful conduct" as "[a]n act performed with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another." Slip op. at 11; see PIK Civ. 4th 103.04 (same definition). The Court of Appeals cited to three cases that

applied the PIK definition to civil litigation in general: *Heckard v. Martin*, 25 Kan. App. 2d 162, 165, 958 P.2d 665 (1998) (under Residential Landlord and Tenant Act, PIK Civ. 3d 103.04 definition of "willful" required tenant have intent to do wrong or cause injury to another); *Tufts v. Newmar Corp.*, 53 F. Supp. 2d 1171, 1178 (D. Kan. 1999) (citing *Heckard* and quoting PIK Civ. 3d 103.04 for proposition that "willful conduct" under the KCPA requires showing intent to do wrong or cause injury to another); and *Griffin v. Security Pacific Automotive Financial*, 33 F. Supp. 2d 926, 930 (D. Kan. 1998) (citing *Heckard* and quoting PIK Civ. 3d 103.04). *Unruh*, slip op. at 12.

This definition of the word "willful" in the PIK instructions was based upon language in a case heard by this court in 1908. See *Railway Co. v. Lacy*, 78 Kan. 622, 629, 97 P. 1025 (1908), *reh. denied* November 12, 1908 ("To constitute willful negligence, there must be a design, purpose, or intent to do wrong or to cause the injury."). It has remained virtually unchanged since the first publication of the pattern instructions. The legislature is presumed to be aware of the existing law when it enacts an amendment. See *State v. Boyer*, 289 Kan. 108, 116, 209 P.3d 705 (2009); *Frick v. City of Salina*, 289 Kan. 1, 8, 208 P.3d 739 (2009). We therefore agree with the reasoning of the majority for the Court of Appeals, find that it was correct, and affirm the holding that the use of "willful" in the KCPA includes an intent to harm the consumer.

Having affirmed the Court of Appeals majority on the question of the elements that the plaintiffs were required to prove, we must next examine whether the plaintiffs met their burden of proof under the standard we have recognized. When a verdict is challenged as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the appellate court should not intervene. *City of Mission Hills v. Sexton*, 284 Kan. 414, 422, 160 P.3d 812 (2007).

In his dissent regarding the sufficiency of evidence for the KCPA claims, Judge Malone summarized the evidence supporting the plaintiffs' case:

"Bret Galyardt, the quality control/warehouse supervisor for Purina, testified that Purina changed the formula for 2HL between the first and second batch that Unruh and Carter received. Purina increased the sunflower meal in the mixture from 5% to 15% and decreased the cottonseed meal from 10% to 0%. No warning was given to the consumers that this might affect the flowability of the product.

"When Unruh and Carter received the second load of 2HL, the ranchers observed that the feed was a different color than the first batch and hard and oily in texture. They were forced to break apart the feed with claw hammers. Over the next several weeks, the ranchers continued to break up the 2HL in the feeders daily but consumption by the cattle dropped. In the meantime, Unruh and Carter attempted to feed their cows as much hay as possible pursuant to Purina's instructions. Galyardt later testified that although certain mixtures of 2HL can sometimes be a little hard, it should not be so hard as to necessitate being broken apart by a claw hammer or a crowbar.

"Unruh notified Purina that his cows were losing weight. Tim Peissig, Purina's district manager, visited both Unruh and Carter in order to investigate and address the problem. Peissig was not aware that Purina and other companies varied the ingredients in their products according to cost. Peissig was aware that 2HL had flowability problems if it got too cold; however, he did not pass along this information to the ranchers because it did not happen very often. After meeting with Unruh, Peissig completed a product complaint report to Purina indicating that Unruh was doing everything Purina had recommended. The report concluded: 'Our formulation change certainly caused the cows to quit eating this product. We need to do what is right for this customer, who wants this product and program to work.' Purina failed to take any corrective action after receiving this report. Although Peissig continued to work with Unruh and Carter, both ranchers subsequently sustained loss of cows and calves." *Unruh,* slip op. at 21-23 (Malone, J., dissenting in part).

In addition to the foregoing, there was evidence that bags of the supplement "set up like concrete."

On appellate review, this court accepts as true the evidence and all the inferences to be drawn from it which support or tend to support the findings, verdict, and judgment below, while disregarding any conflicting evidence or other inferences that might be drawn from the evidence. When a jury's findings are attacked as being based on insufficient evidence or being contrary to the evidence, this court's power begins and ends with a determination of whether there is evidence to support those findings. If the evidence supports the jury's findings, this court will not disturb them on appeal. It is of no consequence that contrary evidence might have supported different findings if believed by the jury. Special findings

by a jury are to be construed liberally on appeal and interpreted in light of the testimony to ascertain their intended meaning. *Calver v. Hinson*, 267 Kan. 369, 375, 982 P.2d 970 (1998) (quoting *Brunner v. Jensen*, 215 Kan. 416, Syl. ¶¶ 4 and 5, 524 P.2d 1175 [1974]).

The jury was properly instructed on the law of the case and found there were violations of the KCPA. The jury, as the trier of fact, was best situated to weigh the evidence and assess the credibility of the witnesses. Judge Malone found this evidence sufficient to prove the plaintiffs' case under either definition of "willful." Slip op. at 21-23 (Malone, J., dissenting in part). We agree and find that the evidence and all the inferences drawn from it, when considered in the light most favorable to the prevailing party, supported the verdict. We therefore reverse the Court of Appeals on this issue and find sufficient evidence to support the jury's verdict on the KCPA claims.

## V. VERDICT FORMS

The verdict forms given to the jury mistakenly captioned the case "Kenneth E. Unruh and Robert K. Carter, Plaintiffs, vs. State Farm Mutual Automobile Insurance Company, Defendant." State Farm was not a party to this case. It appears the captions were copied from the verdict form of another case, and the court inadvertently neglected to change the name of the defendant. Purina did not object to the captions when the verdict forms were given to the jury, and only after the jury returned its verdict did the district court note the mistake. Purina filed a K.S.A. 60-259(a) motion for new trial based in part on the mistaken captions, which the district court overruled. Purina argues on appeal that the captions were inherently prejudicial and require a new trial.

"The failure to object to a jury instruction invokes a clearly erroneous review standard, whereby we must be able to declare a real possibility existed that the jury would have returned a different verdict if the trial error had not occurred." *Gilley v. Kansas Gas Service Co.*, 285 Kan. 24, 28, 169 P.3d 1064 (2007); see K.S.A. 60-261. While a verdict form is not technically a jury instruction, it is part of the packet sent with the jury which includes the instructions

and assists the jury in reaching its verdict. It is appropriate to apply the same standard of review applicable to the review of instructions.

The decision on this issue, therefore, turns on whether this court finds the inadvertent reference to the defendant as an insurance company to be clear error. A line of Kansas cases holds that injecting the possibility of an insurance carrier into a proceeding is inherently prejudicial. Other cases hold, however, that the failure to object to the mention of insurance coverage undermines the issue on appeal. In addition, there is a body of cases holding that captions in jury instructions are too insubstantial to create a presumption of prejudice.

A long line of Kansas cases suggest that the deliberate injection of insurance into trial testimony constitutes prejudicial and reversible error. See, *e.g.*, *Harrier v. Gendel*, 242 Kan. 798, Syl. ¶ 2, 751 P.2d 1038 (1987) (introduction of evidence of collateral source benefits is inherently prejudicial because it may induce a jury to decide cases on improper grounds); *Ayers v. Christiansen*, 222 Kan. 225, 228, 564 P.2d 458 (1977) (introducing evidence of defendant's insurance status in regard to issue of fault is irrelevant and prejudicial); *Kelty v. Best Cabs, Inc.*, 206 Kan. 654, Syl. ¶ 1, 481 P.2d 980 (1971); *Caylor v. Atchison, T. & S. F. Rly. Co.*, 189 Kan. 210, 214, 368 P.2d 281 (1962) ("Where the offending party secures a verdict *and the opposing party makes a timely objection*, and otherwise has adequately protected the right to review, the offense [of introducing evidence of insurance coverage] is so inherently prejudicial as to require reversal unless unusual circumstances are shown . . . . [Emphasis added]).

The rule that a party may not introduce evidence of insurance coverage, see K.S.A. 60-454, is not, however, absolute. In the present case, the captions on the jury verdict forms appear to have been an inadvertent mistake. The defendant did not notice the mistake, despite having the opportunity to review the forms on at least two occasions, and did not object to the mistake. "[W]hen the mention of insurance during a trial is purely inadvertent and is not brought into the case by intentional misconduct of plaintiff's counsel prejudicial error has not been committed thereby. [Citations

omitted.]" *Langley v. Byron Stout Pontiac, Inc.*, 208 Kan. 199, 203, 491 P.2d 891 (1971).

Furthermore, when a plaintiff's doctor referred to possible insurance coverage for the plaintiff and the defendant failed to object but later moved for a mistrial, this court held that the inadvertent injection of insurance coverage into a trial may be cured by limiting instructions. See *Kelty*, 206 Kan. at 655-57. Even though no curative instructions were given in that case, the error "was obviously induced by defense counsel's failure to file a motion for such relief and by his statement to the court that he did not wish to have the jury admonished." 206 Kan. at 656.

In addition, a number of courts have held that the caption of a document submitted to a jury will not generally be a source of reversible error. The Oklahoma Supreme Court has held: " 'As a general rule the caption of a verdict is not a material part thereof, and courts will not ordinarily be governed thereby, but rather by the body of the verdict or findings.' " *Henry Building Company v. Cowman*, 363 P.2d 208, 214 (Okla. 1961) (quoting *St. Louis & S. F. R. Co. v. Williams*, 55 Okla. 682, 685, 155 Pac. 249 [1916]); see also *Underhill v. Commonwealth*, 289 S.W.2d 509, 511-12 (Ky. App. 1956) (error in caption of instructions naming accomplices instead of defendants was technical and did not mislead jury); *O'Flynn v. Owens-Corning Fiberglas*, 759 So. 2d 526, 532 (Miss. App. 2000) (no objection to caption of instructions and jury form that erroneously included party that had settled out of court; issue not preserved for appeal); *State ex rel. Thompson v. Watkins*, 200 W. Va. 214, 219, 488 S.E.2d 894 (1997) (erroneous caption of jury instructions in criminal trial was mere surplusage and harmless); *Anderson v. Alfa-Laval Agri, Inc.*, 209 Wis. 2d 337, 349-50, 564 N.W.2d 788 (Wis. App. 1997) (not error to include in caption read to jury defendant who had settled out of court).

The Court of Appeals noted that Purina is, in the mind of the average person, a multinational concern that is one of the largest suppliers of animal feed in the United States and found it "rather unlikely that the jurors would have awarded [$64,075] against Purina based on the notion that in doing so they need not worry about Purina because the judgment would be covered by insurance." *Un-*

*ruh*, slip op. at 8-9. This reasoning is sound. The caption of an instruction or verdict form is usually considered surplusage, having little, if any, impact on the jury. The captions of the verdict forms did not constitute clear error.

## VI. ATTORNEY FEES

The district court awarded the plaintiffs attorney fees totaling $37,950, which included $35,900 expended in prosecution of the KCPA claims, $1,000 expended in prosecuting the motion for attorney fees, and $1,050 in expert witness fees generated in supporting the motion for attorney fees. Purina argues that attorney fees under the KCPA should be awarded only when the court has evidence of the losing party's bad faith. The majority of the Court of Appeals did not address this issue in its opinion, having found that the KCPA did not apply. *Unruh*, slip op. at 18-19. Judge Malone would have affirmed the award of attorney fees. Slip op. at 23 (Malone, J., dissenting in part).

The issue of the district court's authority to award attorney fees is a question of law over which appellate review is unlimited. *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 490, 173 P.3d 642 (2007). Where the trial court has authority to grant attorney fees, its decision is reviewed under the abuse of discretion standard. *Tyler v. Employers Mut. Cas. Co.*, 274 Kan. 227, 242, 49 P.3d 511 (2002). While the authority to award attorney fees is a question of law, the *amount* of such an award is within the sound discretion of the district court and will not be disturbed on appeal absent a showing that the district court abused that discretion. *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 940, 135 P.3d 1127 (2006).

A court may not award attorney fees absent statutory authority or an agreement by the parties. Without such authority, a trial court's equitable powers do not extend to the awarding of attorney fees. *Idbeis* 285 Kan. at 495. The KCPA provides for attorney fees, while no provision for attorney fees exists under the plaintiffs' common-law theory of damages.

K.S.A. 50-634(e) provides:

"(e) Except for services performed by the office of the attorney general or the office of a county or district attorney, the court may award to the prevailing party

reasonable attorney fees, including those on appeal, limited to the work reasonably performed if:

(1) The consumer complaining of the act or practice that violates this act has brought or maintained an action the consumer knew to be groundless and the prevailing party is the supplier; or a supplier has committed an act or practice that violates this act and the prevailing party is the consumer; and

(2) an action under this section has been terminated by a judgment, or settled."

Purina asks this court to add to the statutory language an implicit requirement that the supplier has acted in bad faith. This argument asks the court to read into the statute language that is not present and to interpret the statute in a manner less liberal to consumers.

If the legislature intended a bad-faith requirement, it could have included such language. Compare the preceding KCPA language with the following language in the Kansas Open Records Act, for example:

"In any action hereunder, the court shall award costs and a reasonable sum as an attorney's fee for services rendered in such action, including proceedings on appeal, to be recovered and collected as part of the costs to the plaintiff *if the court finds that the agency's denial of access to the public record was not in good faith and without a reasonable basis in fact or law.*" (Emphasis added.) K.S.A. 2008 Supp. 45-222(c).

Furthermore, the very language of the KCPA distinguishes between attorney fees for plaintiff consumers and attorney fees for defendant suppliers. Suppliers may receive attorney fees if the consumer brought an action that "the consumer knew to be groundless"; consumers, on the other hand, may receive attorney fees if a supplier "committed an act or practice that violates this act." K.S.A. 50-634(e)(1). The language is clear and unambiguous: any violation of the KCPA by a supplier constitutes grounds for attorney fees.

The language allowing attorney fees on appeal was added to the KCPA as part of the same 1991 legislation that amended K.S.A. 50-626(b)(3) to use the word "willful" instead of "intentional." See L. 1991, ch. 159, sec. 2. A letter from Assistant Attorney General D. Jeanne Kutzley, dated April 3, 1991, indicated the Attorney General was supporting the bill that generally broadened consumer rights, stating: "[W]e added language that would allow individual

consumers who bring a private action to get attorney fees on appeal." Minutes, Sen. Judiciary Comm. April 3, 1991, attach 1. While this statement is neutral, it does not support a legislative intent to add to the statute a bad-faith requirement that is not explicitly present in the statutory language.

The KCPA provides for attorney fees when a supplier willfully fails to disclose relevant information to a consumer. This court finds that the conditions of the KCPA were met by the plaintiffs' evidence. The award of attorney fees was appropriate and was not an abuse of discretion.

Purina further contends that counsel for the plaintiffs failed to segregate their time devoted to express and implied warranty claims and their claims under the KCPA. Purina argues that this failure to break the time down by the alternative theories that the plaintiffs pursued constitutes reversible error.

Where the trial court has authority to grant attorney fees, its decision is reviewed under the abuse of discretion standard. *Tyler*, 274 Kan. at 242. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *In re Marriage of Bradley*, 282 Kan. 1, 7, 137 P.3d 1030 (2006).

In *DeSpiegelaere v. Killion*, 24 Kan. App. 2d 542, 549, 947 P.2d 1039 (1997), our Court of Appeals held:

"Where several causes of action are joined and only some of them permit the award of attorney fees, the work on several causes must be segregated in determining an attorney fee award.

"Here, we find that there are 12 of the stated defects which are not part of the fraud or KCPA claims. There is no basis for an award of fees for the prosecution of these claims. We recognize that Kansas has not had a clearly stated rule for this legal issue. In the future, if counsel have made no attempt in their time records to segregate their time as to different causes of action that are not mutual in their facts and impossible of segregation, it could well be that a court could find a failure of proof and award no attorney fees."

Purina relies on this language in arguing that the district court erred in granting attorney fees when counsel for the plaintiffs failed

to segregate their time devoted to developing the warranty claims from their time devoted to developing the KCPA claims.

In *York v. InTrust Bank, N.A.*, 265 Kan. 271, 308, 962 P.2d 405 (1998), this court found that the district court's award of attorney fees was not an abuse of discretion. Under the facts of that case, the court held:

"It was clearly necessary for all of the underlying facts of the transaction to be fully developed in order to prosecute the KCPA claim. Those services may have also resulted in findings of other tortious conduct sufficient to justify a judgment, but the KCPA claim is inextricably intertwined with the single transaction which is the subject of this litigation." 265 Kan. at 308.

In the present case, Purina contends that the plaintiffs' case was from the beginning directed toward the breach of warranty claims and the KCPA claims were an afterthought. Counsel for the plaintiffs did not submit fees for time prior to filing their motion to amend the petition to include their claims under the KCPA.

The district court heard the testimony of Mikel Stout, an attorney with approximately 45 years' experience in civil litigation, relating to the attorney fees. He testified in a general manner to the reasonableness of the hourly rate, $250, and the reasonableness of the amount of time devoted to developing and trying the case, 143.60 hours. He expressed doubts about whether it would be possible to segregate the time spent on the warranty claims from the time spent on the KCPA claims. Purina elected not to present expert testimony on the attorney fees question.

The district court found the requested attorney fees reasonable. The court made the following finding with respect to the segregation of fees:

"4.  Defendant's contention that Plaintiffs are not entitled to recover attorney fees based upon a failure to segregate the time billed in connection with prosecution of the KCPA claim fails. Plaintiffs pursued two theories of recovery: breach of express and implied warranties, and violations of the KCPA. Under either theory, Plaintiffs were required to prove that Defendant made representations about its product that were false. Given the overlap in the elements of each cause of action, Mikel Stout testified that it would be difficult if not impossible for Plaintiffs counsel to segregate the time spent prosecuting each theory.

"5.  It was necessary for Plaintiffs to fully develop all the underlying facts of the claim for breach of express and implied warranties in order to prosecute the

KCPA claim. Thus, the KCPA claim is inextricably intertwined with the claim for breach of express and implied warranties. The fact that Plaintiffs could not segregate the time spent prosecuting the KCPA claim versus the claim for breach of express and implied warranties does not prevent Plaintiffs from recovering attorney fees. See *York v. Intrust Bank, N.A.*, 265 Kan. 271, 308, 962 P.2d 405 (1998)."

The district court order was based on the expert testimony that it heard and its understanding of the nature of the claims presented in the case. The district court is considered an expert in the area of attorney fees and can draw on and apply its own knowledge and expertise in determining the value of the services rendered. *Johnson*, 281 Kan. at 940. The district court's ruling was based on substantial competent evidence, was in accord with the law, was not an abuse of discretion, and we affirm its decision.

The plaintiffs filed a motion for appellate attorney fees before the Court of Appeals, seeking an additional $17,757.50, based upon an hourly rate of $200 to $225 depending on the attorney doing the work, and a total of 79.50 hours. Purina filed a response, disputing whether the KCPA applied and whether the plaintiffs were entitled to fees in a non-KCPA action. The Court of Appeals, based on its finding that the KCPA claims were not met, denied the motion. The plaintiffs renewed their motion in this court, although it is miscaptioned, and added an additional request for $20,957.75 in appellate fees, consisting of $19,765 in attorney fees (a rate of $225 to $250 and a total of 82.40 hours) and $1,192.75 in expenses. Purina does not challenge the reasonableness of the hourly rates, time, or expenses applied for by plaintiffs' counsel. Purina simply renews its objection that there was no KCPA violation, which is an argument we have rejected for the reasons stated above. We have reviewed the motion, find the fees and expenses reasonable, and hereby grant it. In total, therefore, the plaintiffs are entitled to recover $76,665.25 in attorney fees and expenses.

The decision of the Court of Appeals is affirmed in part and reversed in part. The decision of the district court is affirmed. The plaintiffs' motions for appellate attorney fees and expenses are granted.

\* \* \*

ROSEN, J., concurring in part and dissenting in part: I concur

with the result reached by the majority. I write separately in order to express my disagreement with the majority's conclusion that the legislature intended to place the burden on the consumer of demonstrating malicious intent on the part of a supplier under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*

As the majority correctly notes, a statute should not be read to add something that is not contained in the language of the statute. *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 521, 154 P.3d 494 (2007). "An appellate court's first task is to 'ascertain the legislature's intent through the statutory language it employs, giving ordinary words their ordinary meaning.' [Citation omitted.]" *State v. Gracey*, 288 Kan. 252, 257, 200 P.3d 1275 (2009).

The reasoning by the majority gives little credence to the first principle of statutory interpretation: reading the plain language of the statute as the legislature enacted it and giving ordinary words their ordinary meanings. The majority implicitly rejects the premise that courts should not add something to a statute that is not contained in the language of the statute.

Webster's Third New International Dictionary 2617 (Unabridged 1993) defines "willful" as "done deliberately: not accidental or without purpose." The same dictionary defines "intentional" as "done by intention or design." Webster's 1176. Black's Law Dictionary 1630 (8th ed. 2004) defines "willful" as "[v]oluntary and intentional, but not necessarily malicious." It defines "intentional" as "[d]one with the aim of carrying out the act." Black's Law Dictionary, 826. The dictionary definitions demonstrate at best a subtle distinction between the words "willful" and "intentional." Neither dictionary definition of "willful" suggests a requisite element of intention to do wrong or cause injury.

It is true that the legislature amended K.S.A. 50-626(b)(3) in 1991 and 1993 to change the word "intentional," which appeared twice in that paragraph as originally enacted, to "willful." See L. 1991, ch. 159, sec. 2; L. 1993, ch. 177, sec. 1. A review of the legislative history indicates, however, that the legislature was merely making the language of that section consistent with other sections of the KCPA.

In a letter to the Senate Judiciary Committee dated April 3, 1991, Assistant Attorney General Jeanne Kutzley stated the Attorney General's support of amendments to the KCPA. She characterized the amendments as "basically a cleanup of the door to door sales portion of the consumer protection act" and noted that the amendments sought to make terms used within the KCPA consistent. Minutes Sen. Judiciary Comm. April 3, 1991, attach. 1. The overall emphasis of the amendments was to provide greater protection for consumers when dealing with misrepresentations and to provide for attorney fees on appeal.

The Minutes of the Senate Judiciary Committee on March 9, 1993, also reveal an intention to expand protection for consumers from misrepresentations and to increase long-arm jurisdiction over suppliers engaging in consumer transactions in Kansas. A February 19, 1993, letter from Assistant Attorney General Mark Stafford referred to changes in K.S.A. 50-626(b)(2) and (b)(3) as "clean-up language." The letter went on to note that "[v]iolations of the Kansas consumer protection act do not always amount to tortious activity as defined by our courts" and urged the legislature to broaden its protection of Kansas consumers by granting them relief beyond what tort and contract law historically provided. Minutes, Sen. Judiciary Comm. March 9, 1993, attach. 2.

Nothing in the legislative history remotely suggests that the legislature sought to restrict protection for Kansas consumers by enacting the 1991 and 1993 amendments—the amendments instead had an overriding purpose of broadening the rights of Kansas consumers, especially in the area of misrepresentations. The majority of this court concludes, however, that the substitution of "willful" for "intentional" must have been grounded in a legislative desire to increase the burden of proof for consumers under the KCPA, especially in the area of misrepresentations.

There is another plausible explanation for the substitution of words. Other sections of the KCPA, consumer protection, and the Kansas Fair Credit Reporting Act have used the words "willful" or "willfully." See K.S.A. 50-631(e) (L. 1973, ch. 217, sec. 9); K.S.A. 50-636(b) (L. 1973 ch. 217, sec. 14); K.S.A. 50-657(b)(1) (L. 1988, ch. 193, sec. 6); K.S.A. 50-709(e) (L. 1973, ch. 85, sec. 144); K.S.A.

50-715 (L. 1973, ch. 85, sec. 150). The Senate Judiciary Committee considered testimony referring to "cleaning up" the statutory language to make it consistent. Given the broadening of consumer rights in other parts of the KCPA, it appears likely that the change from "intentional" to "willful" reflected only an effort to make the statutory language consistent, not an effort to restrict consumer rights in the specific arena of misrepresentations.

This conclusion is consistent with K.S.A. 50-623, which explicitly states the purpose and philosophy of construction of the KCPA is to protect consumers: "This act shall be construed liberally to promote the following policies: . . . (b) to protect consumers from suppliers who commit deceptive and unconscionable practices." See *Moore v. Bird Engineering Co.*, 273 Kan. 2, 10, 41 P.3d 755 (2002).

The Court of Appeals majority and the majority of this court ground their analysis on PIK Civ. 4th 103.04. This analysis appears backwards: jury instructions should be based on interpretation of statutory law; interpretation of statutory law is not based on jury instructions. PIK instructions must conform with the duties imposed by the legislature. See *Carlson v. Ferguson*, 270 Kan. 576, 581-82, 17 P.3d 333 (2001).

The PIK instruction is based in part on *Railway Co. v. Lacy*, 78 Kan. 622, 629, 97 P. 1025 (1908), where this court found that "willful negligence" contains a requirement that "there must be a design, purpose, or intent to do wrong or to cause the injury." The relevance of *Lacy* to the present case is dubious: willful negligence and the willful conduct specified in the KCPA are not necessarily identical concepts. By adopting the *Lacy* definition, the majority is adding the complex phrase "to do wrong or to cause injury" to the common understanding of intent or willfulness. This addition avoids giving common meanings to common words and adds to the language of the statute, violating our long-held principles of statutory interpretation and contravening the obvious legislative intent of increasing protection for consumers.

Although I agree with the majority of this court that the facts of this case suffice to support the jury's award under either reading of the statute, I disagree with the majority's construction of the

KCPA that increases the burden on consumers who seek to protect their rights against misinformation from suppliers.

DAVIS, C.J., AND BILES, J., join the foregoing concurring and dissenting opinion.