(269 P.3d 833)
No. 104,950

IN THE MATTER OF THE APPEALS OF EDMISTON OIL COMPANY, INC., *et al.*, FROM ORDERS OF THE DIVISION OF TAXATION ON APPLICATIONS FOR REFUND OF SALES/USE TAX.

970

Opinion filed January 13, 2012.

Jeffrey A. Wietharn and S. Lucky DeFries, of Coffman, DeFries & Nothern, of Topeka, for appellants.

John Michael Hale, of Legal Services Bureau, Kansas Department of Revenue, for appellee.

Before GREENE, C.J., ATCHESON, J., and BRAZIL, S.J.

GREENE, C.J.: Edmiston Oil Company and a host of other oil and gas producers (Taxpayers) appeal the decision of the Kansas Court of Tax Appeals (COTA) that denied them a sales and use tax exemption on down-hole machinery and equipment, as well as surface pumping equipment, under K.S.A. 2010 Supp. 79-3606(kk). Concluding that the subject machinery and equipment is not used as an integral part of integrated production operations by a processing plant or facility operated by a processing business where the oil or gas that has been extracted from the earth is then treated or prepared before its transmission to a refinery or wholesale distribution as contemplated by the applicable statute, we affirm COTA in denying the tax exemption for the purchases of such machinery and equipment.

## FACTUAL AND PROCEDURAL BACKGROUND

Taxpayers applied to the Director of Taxation for a refund of sales and use taxes paid in Kansas for the purchases of certain oilfield machinery and equipment after the legislature substantially amended K.S.A. 79-3606(kk) in the 2000 session. See L. 2000, ch. 123, sec. 1; K.S.A. 2010 Supp. 79-3606(kk). Specifically, their claims remaining in this appeal include requests for sales and use tax refunds on purchases of pumping and down-hole machinery and equipment, including gas compressors and lines; surface pumping units, engines, and motors; down-hole pumps, rods, tubing, tubing strings, production casing strings, and cathodic protection; valves and fittings; and electrical equipment. Taxpayers essentially claimed these purchases were for machinery and equipment used as an integral part of an integrated production

operation by a processing plant owned by a processing business, and thus eligible for exemption under K.S.A. 2010 Supp. 79-3606(kk).

After the Director of Taxation denied these refund applications and that denial was upheld by the Secretary of Revenue, Taxpayers appealed the matters to COTA. COTA's small claims division upheld the denial of refunds, and Taxpayers then petitioned COTA for an evidentiary hearing. COTA resolved the claims on two rounds of summary judgment proceedings, based on uncontroverted facts as follows:

"6. Oil and gas is contained in rock formations, or [in] the earth. Oil and gas is free to move through rock formations over time, so [it] must accumulate in traps to pool sufficient quantities to warrant drilling, equipping and producing the oil or gas.

"7. Traps can be structural in nature in which the oil and gas accumulate in the upper part of rock folds or in faults and fractures. Traps can be stratigraphic in nature where oil and gas accumulates in the upper part of the changes in rock types that prevent the further migration of the oil and gas. Traps can be a combination of structural and stratigraphic traps. To remove oil and gas from the earth, wells are drilled to locate and extract the oil and gas from the rock and out of the earth and then deliver it to the surface where it can be sold.

"8. After a successful well is drilled to the total depth, casing pipe is run into the well and cemented in place. This prevents the rock formations from collapsing and closing up the hole. The casing in the well bore then becomes the equivalent of a mine shaft for extracting the oil and gas from the earth or rock formation. Without the casing in the well, over time, the well would fall in or collapse on itself, plugging off the well.

"9. After the production casing is cemented in the hole, a perforating 'gun' is lowered inside the casing to the depth where the oil or gas was identified during drilling. The 'gun' is set off, firing individual focused charges that burn a hole through the casing and cement into the rock formation. This opens channels into the rock or earth for the oil, gas, condensate and water to migrate to the well bore.

"10. The perforated interval will require additional treatment before the rock will allow the fluids to flow properly. Acid is pumped into the perforated interval to dissolve the cement and the rock around the perforations, to provide better channels for flow.

"11. In some rock formations, the oil, gas, condensate, and water is trapped in the rock because the pore spaces are not well connected, or lack permeability. Such wells require more than perforations and acid to cause the fluids to migrate to the well bore. In those cases, the rock formation is given a frac treatment which

involves pumping a gelled fluid, or an inert gas like nitrogen or carbon dioxide, along with sand at high pressure into the rock. The pressures generated by this treatment create small cracks or fractures in the rock that get filled with the sand. When the frac treatment ends, the pressure slowly dissipates and the rock formation relaxes and begins to close the artificial fractures that were created. The sand that was pumped along with the fluids fills the newly created artificial fractures, leaving a channel for the oil, gas, condensate and water to migrate to the well bore.

"12. Originally, oil and gas is trapped in the rock formations under considerable pressure. The well bore created by drilling into the rock creates a low pressure point. The oil and gas migrates through the rock to the low pressure point in an effort to equalize the pressure in the formation. This migration to the well bore is the primary method of extracting oil, gas, condensate and water from the earth. It would not happen without the construction of the well to provide the means for the fluids to leave the rock formation.

"13. Once the pressure in the formation has depleted sufficiently, there is no longer enough pressure to carry the fluids to the surface. At this point, fluid migration or extraction of the fluids from the rock ceases to happen as the reservoir finds a new pressure equilibrium. To overcome this new equilibrium point, pumping equipment is installed, known in the industry as 'artificial lift.'

"14. The most common type of mechanical assistance or 'artificial lift' is the rod pump operated by the pumping unit. In all cases, the purpose of the artificial lift is to mechanically lower the hydrostatic pressure of the fluids in the well bore by pumping the fluids to the surface. If the hydrostatic pressure is not relieved, the fluids will reach an equilibrium point and will not migrate to the well bore and extraction of the fluids from the rock cannot take place."

COTA also adopted the following additional facts:

"In some cases, due to lowering of the pressure in the tubing or well bore, some separation may occur in the tubing on the way to the surface. The primary purpose of the tubing is to convey the oil to the surface so that it can be separated from the gas and water that produced along with oil. The majority of separation is done using surface equipment. [Parties' stipulation.]

. . . .

"Generally, the pumping unit is connected to the rods, the rods are connected to the pump, the pump is connected to the tubing, the tubing is connected to the wellhead, the wellhead is connected to the flow (lead) lines, and the flow lines are connected to the tank battery.

"The pumping and down-hole machinery and equipment are an integral or essential part of oil and gas well operations. Without such machinery/equipment, the oil and gas are not able to reach the surface, particularly after the formation pressure is depleted. The pumping and down-hole machinery and equipment is dedicated to the oil/gas wells where the same is located and cannot be easily (if at all) moved or applied to tasks away from the oil/gas well."

COTA's first order on the summary judgment motions found that the phrase "extracted from the earth" was "reasonably interpreted to mean the operations occurring after the oil or gas has been extracted from the surface of the earth." COTA granted the Kansas Department of Revenue's (KDR) motion for summary judgment in part and denied Taxpayers' motion for summary judgment. Following that order, Taxpayers filed a second motion for summary judgment, arguing the machinery and equipment qualified for a tax exemption under K.S.A. 2010 Supp. 79-3606(kk)(1)(A) and (2)(A), as well as K.S.A. 2010 Supp. 79-3606(kk)(3). COTA then denied Taxpayers' second motion for summary judgment. Taxpayers filed a motion for reconsideration of both orders issued by COTA, which COTA denied. Taxpayers timely appeal.

## STANDARDS OF REVIEW

COTA orders are subject to appellate review under the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.* Whether certain property is exempt from ad valorem or sales and use taxation is a question of law if the facts are not in dispute, but it is a mixed question of law and fact if the facts are controverted. "This court's review of statutory interpretation in tax appeal matters is unlimited, and an appellate court applies the same general rules that are applied in other contexts." *In re Tax Appeals of Genesis Health Clubs*, 42 Kan. App. 2d 239, 242, 210 P.3d 663 (2009), *rev. denied* 290 Kan. 1094 (2010).

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). Kansas appellate courts no longer give deference to an agency's interpretation of a statute and, therefore, have unlimited review. *Saylor v. Westar Energy, Inc.*, 292 Kan. 610, 614, 256 P.3d 828 (2011); *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 904, 249 P.3d 434 (2011); *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010); *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, Syl. ¶ 2, 228 P.3d 403 (2010); *In re Tax*

*Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 471, 239 P.3d 96 (2010).

"When courts are called upon to interpret statutes, they begin with the fundamental rule that they must give effect to the intent that the legislature expressed through the plain language of the statutes, when that language is plain and unambiguous. See *State v. Valladarez*, 288 Kan. 671, 675-76, 206 P.3d 879 (2009). An appellate court's first task is to ascertain the legislature's intent through the statutory language it employs, giving ordinary words their ordinary meaning. *State v. Gracey*, 288 Kan. 252, 257, 200 P,3d 1275 (2009). Only if the statutory language is not plain and unambiguous are the courts called upon to resort to canons of statutory construction or consult legislative history. See *Valladarez*, 288 Kan. at 675-76." *In re Tax Exemption Application of Mental Health Ass'n of the Heartland*, 289 Kan. 1209, 1211, 221 P.3d 580 (2009).

In construing tax exemption statutes, we strictly but reasonably construe the statutory language against exemption and in favor of taxation.

"Statutes imposing a tax must be interpreted strictly in favor of the taxpayer. However, tax exemption statutes are interpreted strictly in favor of imposing the tax and against allowing an exemption for one that does not clearly qualify. *In re Tax Appeal of Western Resources, Inc.*, 281 Kan. 572, 575, 132 P.3d 950 (2006). Strict construction of an exemption provision does not, however, warrant unreasonable construction. *In re Tax Application of Lietz Constr. Co.*, 273 Kan. 890, Syl. ¶ 7, 47 P.3d 1275 (2002)." *Mental Health Ass'n of the Heartland*, 289 Kan. at 1211.

See also *In re Tax Appeal of Western Resources, Inc.*, 281 Kan. 572, Syl. ¶ 4, 132 P.3d 950 (2006) (K.S.A. 79-3606[kk] must be interpreted strictly because it is a tax exemption statute.).

### OVERVIEW OF APPLICABLE EXEMPTION STATUTE

Taxpayers argue their machinery and equipment purchases were exempt under five separate provisions of K.S.A. 2010 Supp. 79-3606(kk). Although we must consider the entire statute *in pari materia*, the five provisions relied upon by Taxpayers provide as follows:

"(kk)(1)(A) all sales of machinery and equipment which are used in this state as an integral or essential part of an integrated production operation by a manufacturing or processing plant or facility;

. . . .

"(2) For purposes of this subsection:

"(A) 'Integrated production operation' means an integrated series of operations engaged in at a manufacturing or processing plant or facility to process, transform or convert tangible personal property by physical, chemical or other means into a different form, composition or character from that in which it originally existed. Integrated production operations shall include: (i) Production line operations, including packaging operations; (ii) preproduction operations to handle, store and treat raw materials; (iii) post production handling, storage, warehousing and distribution operations; and (iv) waste, pollution and environmental control operations, if any;

. . . .

"(C) 'manufacturing or processing plant or facility' means a single, fixed location owned or controlled by a manufacturing or processing business that consists of one or more structures or buildings in a contiguous area where integrated production operations are conducted to manufacture or process tangible personal property to be ultimately sold at retail. Such term shall not include any facility primarily operated for the purpose of conveying or assisting in the conveyance of natural gas, electricity, oil or water. A business may operate one or more manufacturing or processing plants or facilities at different locations to manufacture or process a single product of tangible personal property to be ultimately sold at retail;

"(D) 'manufacturing or processing business' means a business that utilizes an integrated production operation to manufacture, process, fabricate, finish, or assemble items for wholesale and retail distribution as part of what is commonly regarded by the general public as an industrial manufacturing or processing operation or an agricultural commodity processing operation. (i) Industrial manufacturing or processing operations include, by way of illustration but not of limitation, the fabrication of automobiles, airplanes, machinery or transportation equipment, the fabrication of metal, plastic, wood, or paper products, electricity power generation, water treatment, petroleum refining, chemical production, wholesale bottling, newspaper printing, ready mixed concrete production, and the remanufacturing of used parts for wholesale or retail sale. Such processing operations shall include operations at an oil well, gas well, mine or other excavation site where the oil, gas, minerals, coal, clay, stone, sand or gravel that has been extracted from the earth is cleaned, separated, crushed, ground, milled, screened, washed, or otherwise treated or prepared before its transmission to a refinery or before any other wholesale or retail distribution. . . .

. . . .

"(3) For purposes of this subsection, machinery and equipment shall be deemed to be used as an integral or essential part of an integrated production operation when used:

"(A) To receive, transport, convey, handle, treat or store raw materials in preparation of its placement on the production line;

. . . .

"(5) Machinery and equipment used as an integral or essential part of an integrated production operation shall not include:

"(A) Machinery and equipment used for nonproduction purposes, including, but not limited to, machinery and equipment used for plant security, fire prevention, first aid, accounting, administration, record keeping, advertising, marketing, sales or other related activities, plant cleaning, plant communications, and employee work scheduling;

"(B) machinery, equipment and tools used primarily in maintaining and repairing any type of machinery and equipment or the building and plant;

"(C) transportation, transmission and distribution equipment not primarily used in a production, warehousing or material handling operation at the plant or facility, including the means of conveyance of natural gas, electricity, oil or water, and equipment related thereto, located outside the plant or facility;

"(D) office machines and equipment including computers and related peripheral equipment not used directly and primarily to control or measure the manufacturing process;

"(E) furniture and other furnishings;

"(F) buildings, other than exempt machinery and equipment that is permanently affixed to or becomes a physical part of the building, and any other part of real estate that is not otherwise exempt;

"(G) building fixtures that are not integral to the manufacturing operation, such as utility systems for heating, ventilation, air conditioning, communications, plumbing or electrical;

"(H) machinery and equipment used for general plant heating, cooling and lighting;

"(I) motor vehicles that are registered for operation on public highways; or

"(J) employee apparel, except safety and protective apparel that is purchased by an employer and furnished gratuitously to employees who are involved in production or research activities." K.S.A. 2010 Supp. 79-3606(kk).

Prior to the 2000 amendments to this statute, the first paragraph of the statutory exemption provided the general requirements for sales of machinery and equipment to qualify for exemption from sales and use tax:

"[A]ll sales of machinery and equipment used directly and primarily for the purposes of manufacturing, assembling, processing, finishing, storing, warehousing or distributing articles of tangible personal property in this state intended for resale *by a manufacturing or processing plant or facility or a storage, warehousing or distribution facility*, and all sales of repair and replacement parts and accessories purchased for such machinery and equipment." K.S.A. 1999 Supp. 79-3606(kk).

Our Supreme Court noted that the former version of section (kk) had two requirements to qualify for the exemption: "[T]he machinery and equipment must be (1) used directly and primarily for one of the listed purposes, and (2) used by one of the listed plants or facilities." 281 Kan. at 576.

After amendment, the first portion of the statutory subsection now states:

"The following shall be exempt from the tax imposed by this act:

. . . .

"(kk)(1)(A) all sales of machinery and equipment which are used in this state as an *integral or essential part* of an integrated production operation by a *manufacturing or processing plant or facility*." K.S.A. 2010 Supp. 79-3606(kk)(1)(A).

We note at the outset of our analysis that the legislature has not changed the fact there are dual threshold requirements for exemption: To be eligible for exemption, the subject machinery and equipment must be *both* (a) used as an integral or essential part of an integrated production operation, and (b) used by a manufacturing or processing plant or facility. The amended statute, however, has additional requirements: (1) The integrated production operation must be engaged in at a manufacturing or processing plant or facility that meets the statutory definition, and (2) that plant or facility must be owned or controlled by a manufacturing or processing business that also meets the statutory definition for such an operation. The definition of "processing business" includes operations at an oil or gas well where the oil or gas extracted from the earth is subject to certain listed treatments or preparations.

We must now apply this backdrop of the rather complex statutory exemption scheme to the uncontroverted facts before us.

## DID COTA ERR IN CONCLUDING THAT THE POSTEXTRACTION LIMITATION OF K.S.A. 2010 SUPP. 79-3606(kk)(2)(D)(i) PROVIDES A COMPLETE BASIS FOR DENYING EXEMPTION ELIGIBILITY TO TAXPAYERS?

Taxpayers argue that the term "extracted from the earth" in K.S.A. 2010 Supp. 79-3606(kk)(2)(D)(i) is properly interpreted to mean "extracted from the natural formation" or "extracted from the naturally occurring state" and nothing within the statute re-

quires that the minerals also be brought up to and out of the surface of the earth. The KDR argues that its long-established, bright-line test is the correct interpretation of the statute. The KDR's test "1) exempt[s] services and equipment used in processing after the oil and gas has emerged above the surface of the earth; and 2) tax[es] services and equipment used below the crust of the earth." The KDR emphasized before COTA that the legislature used the past tense of the word "extract," which the KDR argued creates a line of demarcation and that the KDR's bright-line test gives effect to that purpose.

*The Uncontroverted Facts Fail to Establish that Taxpayers' Equipment is Used in Processing or Treatment of Oil that Has Been Extracted From the Earth*

At the outset of our analysis, we note that K.S.A. 2010 Supp. 79-3606(kk)(2)(D)(i) includes within "processing operations" by a "processing business" certain listed operations at an oil or gas well. But the statute includes as such processing only those operations where the oil or gas "that has been extracted from the earth" is subjected to such listed treatments or preparations. Our scrutiny of the uncontroverted facts fails to convince us that oil or gas "has been extracted" before it reaches the earth's surface, or that any of the listed treatments occur prior to the oil or gas actually reaching the surface. Thus, we conclude that the down-hole machinery and equipment, together with the pumping unit and related accessories, fail to satisfy the statutory exemption scheme.

First, as to the phrase "has been extracted from the earth," we reject the notion that extraction occurs when the oil or gas has merely migrated to the well bore. A common dictionary definition of "earth" is "the fragmental material composing part of the surface of the globe," and its alternative dictionary definitions or synonyms include "soil," or "ground" or "soil for cultivating." See Webster's Third New International Dictionary of the English Language 714 (1993). Thus, giving ordinary words their ordinary meaning, it is undeniable that, in the case of oil and gas wells, extraction does not stop at the bottom of the well bore but must also include withdrawing the fluids to the surface. The uncontroverted facts sub-

stantiate this belief, suggesting that "[t]o remove oil and gas *from the earth*, wells are drilled to locate and extract the oil and gas from the rock *and out of the earth* and then deliver it to the surface where it can be sold." (Emphasis added.)

Taxpayers emphasize that movement or migration of fluids occurs in the sub-surface rock formation, but those fluids have not yet been extracted from the earth until they reach the surface. None of the uncontroverted facts suggest that fluids have been extracted from the earth upon mere arrival at the well bore.

Second, as to the listed treatments or processes or preparations, none of these occur at the bottom of the well bore. Although "some [apparently natural] separation may occur in the tubing," the facts establish that "the *primary* purpose of the tubing is to convey the oil *to the surface* so that it can be separated" with surface equipment. (Emphasis added.) There are no uncontroverted facts to suggest that fluids are otherwise—at the bottom of the well bore or within that well bore—"cleaned, separated, crushed, ground, milled, screened, washed, or otherwise treated or prepared" by any of the subject machinery or equipment as required by the exemption scheme in K.S.A. 2010 Supp. 79-3606(kk). When the primary use of the equipment is for a nonproduction purpose, the equipment does not qualify for exemption under K.S.A. 2010 Supp. 79-3606(kk)(2)(F) and (6).

Our conclusion here is consistent with that reached by COTA, which found that the Taxpayers' interpretation would lead to an unreasonable and absurd result.

"The Taxpayers argue that extraction is complete as soon as the oil or gas enters the well bore. Only an expert with significantly more knowledge of the intricacies of the oil and gas drilling process than the ordinary person could contemplate arguing that extraction from the earth ends when the oil or gas flows into the well bore. . . . While man's control over the oil or gas may begin when the oil or gas enters the well bore, the oil or gas has not yet been extracted from earth in ordinary terms as required by the statute. It gives ordinary meaning to the past tense to find that extraction process ends when the oil or gas reaches the surface of the earth. [COTA] is not persuaded that the Taxpayers' interpretation gives ordinary words their ordinary meaning in the context of oil and gas operations."

We agree. The essential requirements of the exemption scheme have not been satisfied by the uncontroverted facts in the record

when the statutory scheme is read giving ordinary words their ordinary meaning.

*Distinctions Between the Sales and Use Tax Exemption Scheme and the Mineral Severance Tax Act Do Not Support Taxpayers' Position.*

Taxpayers argue that the legislature, in drafting K.S.A. 2010 Supp. 79-3606(kk), chose not to use the same terms or definitions contained in the Mineral Severance Tax Act, K.S.A. 79-4216 *et seq.* They contend that if the legislature intended to require that oil and gas be brought up from below the surface of the earth to qualify under K.S.A. 2010 Supp. 79-3606(kk), the legislature would have used the term "sever," but it chose instead to use the word "extract."A close look at the definition of "sever" or "severed" contained in K.S.A. 79-4216 *et seq.*, however, defeats Taxpayers' argument. The K.S.A. 2010 Supp. 79-4216 definitions include the following:

"(l) 'Severed' or 'severing' means: (1) The production of oil through *extraction* or withdrawal of the same from below the surface of the soil or water, whether such extraction or withdrawal shall be by natural flow, mechanical flow, forced flow, pumping or any other means employed to get the oil from below the surface of the soil or water and shall include the withdrawal by any means whatsoever of oil upon which the tax has not been paid, from any surface reservoir, natural or artificial, or from a water surface; (2) the production of gas through the *extraction* or withdrawal of the same by any means whatsoever, from below the surface of the earth or water." (Emphasis added.) K.S.A. 2010 Supp. 79-4216(l).

Comparing the two statutory schemes, the severance tax statute, K.S.A. 2010 Supp. 79-4216(l), equates "severing" of oil with "extraction or withdrawal from below the surface of the soil or water," and the "severing" of gas is equated with "extraction or withdrawal from below the surface of the earth or water." The sales and use tax exemption statute for machinery and equipment used in integrated processing operations, K.S.A. 2010 Supp. 79-3606(kk)(2)(D)(i), that employs of the phrase "extracted from the earth" is thus not materially different from the severance tax scheme. Both statutes seem to clearly measure severance and extraction at the earth's surface. Moreover, "severance tax" is generally defined as "[a] tax imposed on the value of oil, gas, timber

or other natural resources *extracted from the earth*." (Emphasis added.) Black's Law Dictionary 1597 (9th ed. 2009).Taxpayers' argument fails given this commonality between the tax schemes.

*Remaining Arguments of Taxpayers are Rejected*

Taxpayers argue that COTA's articulation of certain factual premises somehow undermines the legal conclusions arrived at by that court. We are not impressed with these arguments. Our analysis on appeal is based upon an application of the statutory scheme to the actual uncontroverted facts before us. To the extent COTA may have articulated these facts in some other fashion, we need not be concerned so long as we have been faithful on appeal to the actual and unadulterated uncontroverted facts in reaching our own legal conclusions. This we have done, and we thus reject any arguments based on COTA's regurgitation of certain factual premises.

Taxpayers also argue that COTA erroneously and unreasonably interprets the phrase "*where* the oil [or] gas . . . that has been extracted from the earth is . . . treated or prepared before its transmission" (emphasis added) in subsection (kk)(2)(D)(i) to effectively replace "where" with "after," suggesting that "the language [of the statute] is not discussing timing or a point in the process, but rather location." This argument, however, overlooks the past tense of "extract" used by the legislature in the statute, which clearly indicates legislative intent regarding timing. The statutory phrase indicates that processing operations include those where oil or gas "that has been extracted from the earth" is subject to the listed treatments or preparations. The plain language of the statutory subsection in K.S.A. 2010 Supp. 79-3606(kk) requires that the substance in question *be extracted from the earth* before examining the nature of the treatments or preparations that may be performed on such an extracted hydrocarbon stream. Taxpayers' argument must be rejected.

Taxpayers finally argue that an above/below ground distinction ignores the actual purpose or use of the equipment. They contend that the above/below ground distinction is not rationally related to the intent of the legislature. In *Western*, however, our Supreme

Court, interpreting the pre-2000 version of K.S.A. 79-3606(kk), looked to the location where the equipment was used, finding that the "legislature specifically limited the exemption to transportation and distribution equipment used 'at the plant or facility.' " *Western*, 281 Kan. at 580. The court found that, as a tax exemption statute, K.S.A. 79-3606(kk) must be strictly interpreted and, "under such an interpretation, if the manufacturing process takes place at a location other than the plant or facility, the sale of machinery and equipment which performs that process is not exempt from sales tax." 281 Kan. at 581. Similarly, in this case, the statute must be strictly interpreted and it states that processing operations may be eligible for exemption where they occur "at an oil well, gas well, mine or other excavation site where the oil, gas, minerals, coal, clay, stone, sand or gravel *that has been extracted from the earth is* cleaned, separated, crushed, ground, milled, screened, washed, or otherwise treated or prepared before its transmission to a refinery or before any other wholesale or retail distribution." K.S.A. 2010 Supp. 79-3606(kk)(2)(D)(i). Here, the plain language used by the legislature shows that if the process takes place *before* the substance is extracted from the earth, it is not exempt.

Further, the function of the equipment here is to extract the oil or gas from the earth. The Taxpayers point to a case where the KDR granted an exemption for a scoop or shovel used to scoop gypsum. In that case, however, the KDR noted that the "equipment [was] used to transport raw material during the production or processing operations, and [*was*] *not used in any extraction activity.*" (Emphasis added.) In contrast, here the subject equipment was completely devoted to the extraction activity.

We have attempted to address each and every argument suggested by Taxpayers, but we consistently arrive at the same conclusion: Taxpayers' equipment simply does not satisfy the clear statutory exemption scheme provided and defined at K.S.A. 2010 Supp. 79-3606(kk)(2)(D)(i) and is therefore not exempt from sales and use taxes.

## Did COTA Err in Rejecting Taxpayers' Arguments for an Exemption under K.S.A. 2010 Supp. 79-3606(kk)(3)(A)?

Taxpayers next argue that COTA erred in rejecting their independent contention that their equipment purchases qualify for exemption under K.S.A. 2010 Supp. 79-3606(kk)(3)(A), which deems equipment to be used as an integral or essential part of an integrated production operation "when used to receive, transport, convey, handle, treat or store raw material in preparation of its placement on the production line." They contend "the below ground tubing and equipment can be likened to a conveyor belt," which together with the pumping machinery "transport[s] the raw materials and place[s] them on the assembly or production line."

Initially, we disagree with Taxpayers' contention that K.S.A. 2010 Supp. 79-3606(kk)(3)(A) is an independent avenue to qualify for a tax exemption. This subsection is an extension or clarification of K.S.A. 2010 Supp. 79-3606(kk)(1)(A) and (2)(A), both of which reference an "integrated production operation." Thus, subsection (3)(A) relates to the *first* threshold requirement to qualify for an exemption: whether the machinery and equipment is used as an integral part of an integrated production operation under K.S.A. 2010 Supp. 79-3606(kk).

Taxpayers argue that they meet the exemption in K.S.A. 2010 Supp. 79-3606(kk)(3)(A) based on COTA's decision in *In re La-Farge Midwest/Martin Tractor Co., Inc.*, No. 2006-8532-DT, dated June 4, 2009; COTA's decision was appealed, and *LaFarge* was transferred to the Supreme Court pursuant to K.S.A. 20-3018(c). The court heard oral arguments on September 1, 2011, and no opinion has been released as of this date. Also, this court is not bound by COTA's decision in *LaFarge*, as this court is not bound by COTA's interpretation of a statute.

Moreover, we do not find COTA's decision in *LaFarge* to be applicable here. There, the precise issue was "whether the Caterpillar loaders and haulers . . . are exempt machinery and equipment under K.S.A. [2010 Supp.] 79-3606(kk) in view of where the machinery and equipment is used at the premises." *LaFarge*, COTA Order, p. 4. In *LaFarge*, COTA found that "[KDR] has failed to

show that the loaders and haulers are not used in 'preproduction operations' to 'receive, transport, convey, handle, treat or store raw materials in preparation of its placement on the production line.' See K.S.A. [2010 Supp.] 79-3606(kk)(2)(A)(ii) and K.S.A. [2010 Supp.] 79-3606(kk)(3)(A)." *LaFarge*, COTA Order, p. 6. In deciding Taxpayers' case, COTA listed many factual distinctions between the present facts and *LaFarge*, including the finding in *LaFarge* that "*the post-extraction operations in question*—though occurring at an excavation site—were still intra-plant operations to receive, handle and transport raw materials to a manufacturing production line." (Emphasis added.) Obviously, we have already concluded that the machinery and equipment in question here is not used in postextraction operations, but rather it fails to meet that aspect of the statutory scheme.

We are not convinced that K.S.A. 2010 Supp. 79-3606(kk)(3)(A) provides any avenue for the exemption of Taxpayers' down-hole and pumping equipment.

DID COTA ERR IN REJECTING TAXPAYERS' ARGUMENT THAT THE OMISSION OF ITS EQUIPMENT FROM K.S.A. 2010 SUPP. 79-3606(kk)(5) IMPLIES ITS EXEMPT STATUS?

Taxpayers next argue that because K.S.A. 2010 Supp. 79-3606(kk)(5) expressly itemizes examples of machinery and equipment that do not qualify for exemption, and the machinery and equipment at issue in this case is not enumerated in that subsection, the legislature intended for all the below-ground and pumping equipment located at the well to be covered by subsection (kk).

We disagree. K.S.A. 2010 Supp. 79-3606(kk)(5) is not an exclusive listing of machinery and equipment that does not qualify for the exemption. This is expressly clarified by K.S.A. 2010 Supp. 79-3606(kk)(6), which states in material part that "Subsections (3) and (5) shall not be construed as exclusive listings of the machinery and equipment that qualify or do not qualify as an integral or essential part of an integrated production operation." The mere omission of equipment such as that of Taxpayers from the list in subsection (kk)(5) suggests nothing of legal significance.

## Did COTA Err in Rejecting Taxpayers' Argument that Its Equipment is Used in Preproduction Operations and Therefore Exempt under K.S.A. 2010 Supp. 79-3606(kk)(1)(A) and (2)(A)

Taxpayers next argue that the subject machinery and equipment should be exempt under the provisions of K.S.A. 2010 Supp. 79-3606(kk)(1)(A) and (2)(A) because if production does not start until the oil or gas reaches the earth's surface, this necessarily means the down-hole and pumping activities must be considered "preproduction operations," and the equipment used is expressly recognized as includable within machinery and equipment used in an "integrated production operation," as defined in subsection (kk)(2)(A).

Taxpayers' argument ignores the language of subsection K.S.A. 2010 Supp. 79-3606(kk)(2)(D)(i), which limits "processing business" for oil and gas operations in a manner already construed and applied above to exclude such equipment. There is no reason to reiterate or elaborate on that analysis. If the oil or gas has not yet been extracted from the earth, the machinery and equipment used for that extraction are not considered to be used in or by a processing business, and that disqualification prevents eligibility for the tax exemption.

## Did COTA Err in Rejecting Taxpayers' Argument that Its Above-Ground Equipment Should Qualify for Exemption under the Statutory Scheme?

Finally, Taxpayers argue that at a minimum, the machinery and equipment located above the ground should be exempt under K.S.A. 2010 Supp. 79-3606(kk)(2)(A) because integrated production operations include preproduction operations to handle, store, and treat raw materials, and the pumping unit "provide[s] the energy required to operate the movement of the raw material through the pre-processing and/or processing parts of the facility." Again, we disagree.

Taxpayers' argument ignores the language of subsection K.S.A. 2010 Supp. 79-3606(kk)(2)(D)(i), which limits "processing business" for oil and gas operations (in the manner already construed

and applied above) to exclude such machinery and equipment. There is no reason to reiterate or elaborate on that analysis. We agree with attorney Thomas E. Hatten, of the Office of Policy and Research at the KDR, who stated that "[s]ales of pumps and derricks to extract oil are also *subject to tax since these are extraction operations rather than 'production' operations as those terms are used in House Bill 2011.*" (Emphasis added.) KDR Opinion Letter 0-2001-003, dated January 3, 2001, p. 3. Again, if the oil or gas has not yet been extracted from the earth, the machinery and equipment used for extraction is not considered part of a processing business, and that disqualification prevents the exemption.

Affirmed.